**Morris King UDALL and Nancy Salmon, Individually and on behalf of all other qualified voters similarly situated, Plaintiffs,**

v.

**Otis BOWEN, Individually and as Governor of the State of Indiana, et al., Defendants.**

**No. IP 76–157–C.**

United States District Court, S. D. Indiana, Indianapolis Division.

April 1, 1976.

R. Davy Eaglesfield, III, William E. Marsh, Indianapolis, Ind., for plaintiffs.

Theodore L. Sendak, Atty. Gen., David H. Kreider, Asst. Atty. Gen., Indianapolis, Ind., for defendants.

Before SWYGERT, Circuit Judge, and HOLDER and DILLIN, District Judges.

## MEMORANDUM OPINION

Morris King Udall, who is seeking the nomination of the Democratic Party for the office of President of the United States, and Nancy Salmon, a registered Democratic voter of Indiana who desires to vote for Udall, and who sues on her own behalf and on behalf of all other similarly situated voters, brought this action to obtain a judgment declaring unconstitutional and enjoining the enforcement of the provision in I.C. 1971, 3–1–9–19 which requires a candidate who wishes his name placed on the Indiana presidential preferential primary ballot to submit petitions bearing a minimum of five hundred (500) signatures of registered voters from each of Indiana's eleven congressional districts. Plaintiffs contend that this provision violates the Due Process and Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

On March 23, 1976, upon motion by defendants, who are election officials of the State of Indiana, the case was dismissed by a single judge of this Court, pursuant to F.R.Civ.P. 12(b)(6), upon his finding that plaintiffs' claim failed to raise a substantial federal question. On March 29, 1976, the United States Court of Appeals for the Seventh Circuit, without expressing its opinion as to the merits of the case, vacated the order of the single judge and remanded the case for determination by a three-judge court convened pursuant to 28 U.S.C. § 2284, 532 F.2d 757 (7 Cir. 1976). The parties, by stipulation, have submitted the case to the three-judge court upon the pleadings, motions, and affidavits already filed herein.

The facts of the case, as shown by the pleadings and affidavits, are clear and undisputed. I.C. 1971, 3–1–9–19, as last amended by Ind.Acts 1976, P.L. 1 (Senate Enrolled Act No. 23), requires a candidate who wishes his name placed on the Indiana presidential preferential primary ballot to submit to the Indiana Secretary of State, by at least fifty (50) days before the date of the primary election, a petition, and counterparts thereof, bearing the signatures of at least five thousand five hundred (5,500) registered Indiana voters. As already noted, the statute also requires a minimum of five hundred (500) signatures of registered voters from each of Indiana's eleven congressional districts. I.C. 1971, 3–1–1–2.5 provides that where an election statute requires a filing to be made by a certain day but does not specify a final hour, the final hour shall be twelve o'clock noon, prevailing time. Applied to this year's filing, these statutes required candidate Udall to file with the Indiana Secretary of State his petition bearing the requisite number of

signatures by twelve o'clock noon, March 15, 1976. .

It is undisputed that candidate Udall, before the filing deadline, complied with the statute by obtaining counterparts of his petition signed by five hundred (500) or more registered voters in each congressional district, all duly authenticated by the appropriate certifying officers. All that remained to assure his name being placed on the ballot was to file such counterparts with the Secretary of State by the filing deadline. Unfortunately, his agents delayed filing until the last minute, and then neglected to file one counterpart containing the signature of approximately one hundred (100) voters registered in the Sixth Congressional District. As a result of such oversight or neglect, the counterparts timely filed from such Sixth District contained only four hundred sixty-five (465) names, and the Secretary of State properly refused to certify Udall as a candidate. Irrespective of the merits of the constitutional argument, it is therefore apparent that the real reason why Udall was not routinely certified as a candidate on March 15, 1976, is his own failure to file a counterpart which was available to him.

■ There is no question but that substantial burdens placed upon the right to vote or to associate for political purposes are constitutionally invalid unless essential to serve a compelling state interest. The Supreme Court has recently restated the principles governing the decision of such cases in *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), saying:

". . . (A)s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes. . . .

"It is very unlikely that all or even a large portion of the State election laws would fail to pass muster under our cases; and the rule fashioned by the Court to pass on constitutional challenges to specific provisions of election laws provides no litmus-paper test for separating

those restrictions that are valid from those that are invidious under the Equal Protection Clause . . . Decision in this context, as in others, is very much a 'matter of degree,' . . ."

■ One consideration, therefore, is as to the extent of the burden imposed upon a candidate by I.C. 1971, 3–1–9–19. As the Court knows judicially, each of the eleven congressional districts contains approximately 471,000 persons, as per the 1971 redistricting, and that approximately 2,937,000 voters were registered, statewide, for the 1974 election—an average of 267,000 per district. Thus to require the signatures of five hundred (500) voters per district amounts to a requirement for slightly over one-tenth of 1% of the persons or slightly less than two-tenths of 1% of the registered voters to sign.

In *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1970), the Court upheld the constitutionality of a Georgia statute providing that an independent candidate for public office may only have his name printed on the ballot if he has filed a nominating petition signed by at least 5% of the number of registered voters at the last general election for the office in question. The Court found that there is "an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of the political organization's candidate on the ballot." It follows, therefore, that. there cannot be anything unconstitutional in the number of signatures required by the Indiana statute.

■ The other objection to the statute is that it is somehow unconstitutional because it requires a minimum number of signatures from each of the eleven congressional districts, and that this is unduly difficult and burdensome. This is similar to appellants' claim in *Jenness*, which the Supreme Court rejected in the following language:

". . . This claim is necessarily bottomed upon the premise that it is inherently more burdensome for a candidate to gather the signatures of 5% of the total

eligible electorate than it is to win the votes of a majority in a party primary. That is a premise that cannot be uncritically accepted. . . ."

Plaintiffs here place reliance on the cases of *Moore v. Ogilvie*, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969), and *Communist Party v. State Board of Elections*, 518 F.2d 517 (7 Cir. 1975). Such reliance is ill-founded. Those cases held invalid Illinois statutes which, by requiring a specified number of signatures from counties of unequal population, effectively gave greater weight to the signatures of voters in relatively less-populous counties. Because the eleven congressional districts in Indiana are substantially equal in population, the ballot access scheme prescribed by I.C. 1971, 3–1–9–19, avoids the equal protection objections of the cases cited.

■ A more recent decision which, by analogy, finds no constitutional difficulty in a statute imposing a reasonable geographical requirement is the January 30, 1976 opinion of the Court in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659. That decision, upholding in large part and rejecting in part the Federal Election Campaign Act of 1971, considered the requirement establishing eligibility for federal funding for a presidential candidate, § 9033 of Chapter 96 of the Act, which sets up as a threshold eligibility requirement that the candidate raise at least $5,000 in each of twenty (20) states, counting only the first $250 from each person contributing to the candidate. The provision was held to be constitutional, on three grounds:

(1) Congress may require " 'some preliminary showing of a significant modicum of support,' *Jenness v. Fortson, supra* . . ." as an eligibility requirement for public funds;

(2) The States have important interests in limiting places on the ballot to those candidates who demonstrate substantial popular support. (Citing *Storer v. Brown, supra* ; *Jenness v. Fortson, supra* ; *Lubin v. Panish*, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974), and *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968);) and

(3) The requirement serves the important public interest against providing artificial incentives to "splintered parties and unrestrained factionalism." (Citing *Storer v. Brown, supra*, and *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972).)

■ Certainly the State of Indiana has a valid interest in requiring the comparatively insignificant activity required by the statute in question in order to keep its presidential preference primary from being degraded, and its ballots unduly lengthened by the candidacy of every publicity seeker who might otherwise file. This is particularly true since, contrary to the statement of the United States Court of Appeals for the Seventh Circuit in its order remanding this case for consideration by a three-judge court, delegates to the national convention are not selected in the primary election. I.C. 1971, 3–1–10–3, provides that all of such delegates be selected by the state convention of the party, and I.C. 1971, 3–1–9–19, provides that such delegates shall "have a duty" to support the candidate receiving the highest statewide primary vote for one ballot only in the national convention. Therefore, since splinter candidates have no chance, as a practical matter, of winning delegate votes by running in the primary, the minimal regulation imposed by the statute is reasonable in degree, protects valid state interests, and is constitutional.

SWYGERT, Circuit Judge (dissenting).

It must be conceded that the state has an interest in setting reasonable requirements for those who wish to become candidates in a statewide primary. As stated in *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1970):

"There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot— the interest, if no other, in avoiding confusion, deception, and even frustration of

**750**

the democratic process at the general election."

On the other hand, a statutory scheme which gives an unequal weight to the votes of citizens depending upon the geographical area of the state where they live is discriminatory and unconstitutional, *Moore v. Ogilvie,* 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969).

In my opinion, I.C. 1971, 3–1–9–19, is both unconstitutional on its face and as applied. *Communist Party v. State Board of Elections, State of Illinois,* 518 F.2d 517 (7 Cir. 1975), supports this conclusion. Although the statutory schemes involved in the two cases are not identical, they are analogous and may not be legally distinguished.

Under the Indiana statutory scheme, the power of voters within a geographical area comprising $^{10}/_{11}$ths of the state's population may be totally diluted by the fact that the remaining $^{1}/_{11}$th of the state's population may not have sufficient voters in support of a candidate to comply with the statutory minimum.

In sum, the statute gives the voters in one congressional district an absolute power over the nomination of a Presidential candidate regardless of the fact that that candidate may have overwhelming support with a majority of the voters in the other ten congressional districts of the state. Thus, there is a denial of equal protection and due process guaranteed to the voters of the State of Indiana by the Fourteenth Amendment.

Admitting the state interest in protecting the integrity of its political processes, due process, nonetheless, requires that the state accomplish that end narrowly and fairly to avoid obstructing and diluting the fundamental right to vote effectively. *Briscoe v. Kusper,* 435 F.2d 1046 (7 Cir. 1970); *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). Since, here, a statewide primary is involved there can be no legitimate state interest in requiring a minimum number of voters' signatures from each congressional district. *See Moore v. Ogilvie, supra,* 394 U.S. at 818–19, 89 S.Ct. 1493.