**M. Philmore HOWLETTE et als., Plaintiffs,**

**and**

**Richmond Independent Taxpayers Association, Inc. et als., Plaintiffs Intervenors,**

v.

**The CITY OF RICHMOND, VIRGINIA et als., Defendants.**

**Civ. A. No. 78–0215–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

April 14, 1978.

J. Durwood Felton, III, Felton & Fagan, Richmond, Va., for plaintiffs.

David M. Shapiro, Caudle & Shapiro, Richmond, Va., Richard J. Knapp, II, Richmond, Va., for plaintiffs-intervenors.

Michael W. Smith, Christian, Barton, Epps, Brent & Chappell, Richmond, Va., Lee F. Davis, Jr., Leslie W. Mullins, Conard B. Mattox, City Atty. for the City of Richmond, Richmond, Va., for defendants.

MEMORANDUM

MERHIGE, District Judge.

Plaintiffs, M. Philmore Howlette and William V. Daniel, who are residents, taxpayers and qualified voters of the City of Richmond, Virginia (the "City"), bring this action on behalf of themselves and a class consisting of all residents, taxpayers and qualified voters of the City of Richmond. This class has been certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure. Plaintiff intervenors are the Richmond Independent Taxpayers Association, Inc. ("RITA"), a non-profit Virginia corporation whose membership is composed of residents of the City and non-residents who are taxpayers of the City, and two individuals, Charles Harper, Jr. and John N. Ambrose, both of whom are residents, taxpayers and qualified voters of the City.[1] The defendant City is a municipal corporation organized and operating under the constitution and laws of the Commonwealth of Virginia. The defendant William J. Leidinger is the City Manager of Richmond, Virginia. Defendant H. Jack Lissenden is the Director of Finance of the City. The plaintiff class seeks an injunction prohibiting the City's planned issuance of $32,200,-000 in general obligation bonds on grounds that the City's enforcement of a certain City Charter requirement for obtaining a referendum on the issuance of such bonds violates three provisions of Federal statutory law and two amendments to the Constitution of the United States. Additionally, plaintiffs seek an order from this Court commanding a referendum on the issuance of the bonds.

The matter comes before the Court on an extensive stipulation of facts. On the basis of said stipulation the Court finds as follows:

Between June 22, 1970 and October 24, 1974, the governing body of the City of

1. Throughout this memorandum the term "plaintiffs" will be used to refer to plaintiffs and plaintiff intervenors together. Arguments made by plaintiff intervenors will be referred to as plaintiffs' arguments unless stated otherwise.

Richmond, its City Council, acting in accordance with its delegated powers under the City Charter, adopted a series of ordinances authorizing the issuance and sale of general obligation bonds to finance various capital improvement projects for the City. On November 28, 1977, the City Council validly adopted certain ordinances, and validly amended certain previously adopted ordinances, authorizing the issuance and sale of $32,200,000 in general obligation bonds to finance various capital improvement projects. The most controversial of these projects, and the one which has prompted the instant litigation, has come to be commonly known as "Project One." This project provides for the razing of a rather large segment of the City's downtown business district and the construction of a new city convention center in its place. On November 30, 1977, the City Clerk caused the required publication of the ordinances and their notices, including the ordinance authorizing the sale of $12,200,000 worth of general obligation bonds earmarked to finance Project One.

Soon after the adoption of the ordinances, various citizens, led by RITA, commenced to circulate petitions and collect signatures in an effort to obtain a referendum on the issuance of the $32,200,000 of bonds.[2] On December 27, 1977, petitions bearing in excess of 12,000 purported signatures of qualified voters of the City were filed, as required, with the Clerk of the Circuit Court of the City of Richmond, Division I, by members of RITA. Each page of these petitions contained an oath by the person circulating the particular petition that he or she had personally witnessed the signature of each person signing the petition. The oath made by the person circulating the petition was notarized. However, the petitions contained no certificate that each of the persons whose names were signed on the petitions had complied with the City Charter by appearing before an officer authorized to administer oaths and making an oath before such officer that he or she was a qualified voter of the City. That is, the persons who signed the petition did not have their signatures individually notarized.

The Clerk of the Circuit Court transmitted the results of the petitions to the Circuit Court of the City of Richmond. The Clerk stated, in pertinent part:

That the general registrar certified to me and I in turn certify to the Court that the said petitions bear names signed thereto in excess of [the required number of] registered voters, but that I further certify that less than [the required number of] signatures to such petitions are verified by attaching thereto a certificate of an officer or officers authorized to adminis-

2. The stipulation of fact contains an explanation of the process prescribed by the City Charter for obtaining a bond referendum. The stipulation states:

   16. That Section 7.07 of the Charter provides for the submission of all Ordinances [except two] to the qualified voters of the City at an election called for the purpose, under enumerated conditions. Such conditions include the filing of a petition with the Clerk of the Circuit Court of the City of Richmond, Division I, within 31 days after publication as aforesaid, requesting submission of the ordinance. Section 4.12, incorporated by reference in Section 7.07 of the Charter provides for such petition to be signed by qualified voters equalling ten percent of the largest number of votes cast in any general or primary election held in the City during the five years immediately preceding, and further provide that the signatures "shall be verified by attaching thereto a certificate of an officer or officers authorized

to administer oaths, that the persons whose names are signed thereto made oath before such officer or officers that they are qualified voters of the City." Where such submission is required, Section 7.07 provides that the bond ordinance does not take effect until the result of such election has been ascertained and determined. The opportunity for a referendum and the conditions under which said referendum is made available were provided for by Sections 7.07 and 4.12, respectively, of the Charter, and said opportunity and conditions were first established by the 1948 revisions to the Charter.
The stipulation further states:
   17. That on December 27, 1977, Alice Clarke Lynch, General Registrar of the City of Richmond determined that at the largest election held in the City in the past five years, the total number of voters was 83,942. Thus, the individually notarized signatures of 8,394 qualified voters—10% of 83,942—were required to obtain a referendum.

ter oaths that the persons whose names are signed thereto made oath before such officer or officers that they are qualified voters of the City of Richmond.

On January 4, 1978, a hearing was held in the Circuit Court of the City of Richmond to determine whether a referendum should be held. RITA, which was represented at this hearing by counsel, requested that the presiding judge, the Honorable Willard I. Walker, order a referendum. The City also appeared at the hearing and requested that Judge Walker order a referendum if he should determine that a referendum was legally required under the applicable provisions of the City Charter. Because far less than the required number of signatures on the petitions had been individually notarized as required by § 4.12 of the City Charter, Judge Walker denied RITA's prayer for a referendum on the ground that his court had "no jurisdiction or power . . to order a referendum or election upon a petition not in compliance with the Charter of the City of Richmond."

Thereafter certain of the parties who desired a referendum applied to the Supreme Court of Virginia seeking a writ of mandamus directing Judge Walker to order the City to hold such a referendum. On January 13, 1978, in a case styled *In re: John Cole Gayle and Matthew Perkins, Petitioners*, the Supreme Court of Virginia denied the application for the writ of mandamus, reasoning as follows:

> Assuming, without deciding, that the referendum prayed to be ordered in this case would not be prohibited by the provisions of Virginia Code § 24.1–165, the Court is of opinion that the petitions requesting the referendum are invalid as they were not verified as required by §§ 7.07 and 4.12 of the Charter of the City of Richmond and that such requirement does not abridge any constitutional right of the petitioners. Accordingly, the Court doth order that the application for a writ of mandamus be denied. . . .

This holding by the highest Court of the Commonwealth of Virginia effectively precluded any relief for the petitioners in the state court system.

On February 27, 1978, plaintiffs filed a class action in this Court, setting forth the facts heretofore stated, alleging Federal constitutional and statutory violations, and requesting declaratory and injunctive relief. On March 10, 1978, RITA, Harper and Ambrose filed a motion for leave to intervene. On March 15, 1978, leave to intervene was granted and the plaintiff intervenors filed their complaint in intervention. All parties have now filed appropriate legal memoranda in support of their respective positions, and the Court has had the benefit of counsels' oral argument. The matter is thus ripe for disposition.

In light of the holding of the Supreme Court of Virginia that the petitions were invalid according to the pertinent provisions of the Richmond City Charter, the validity of the petitions under the City Charter is not in question. The ruling of the Supreme Court of Virginia is final and binding as to all matters of state law. Nor is the validity of the bond ordinances challenged by plaintiffs in this proceeding. Consequently, the issue before this Court is a narrow one. Plainly stated, the sole question for decision is whether enforcement of the City Charter requirement that each signature on a petition seeking a referendum be individually notarized is violative of Federal statutory or constitutional law.

Plaintiffs marshal five distinct arguments in support of their position that the individual notarization requirement is invalid. First, they contend that enforcement of the individual notarization requirements and the resulting denial of a referendum constitutes a denial of the plaintiffs' right to vote on the basis of immaterial errors and omissions, in violation of 42 U.S.C. § 1971(a)(2)(B), a provision of the Civil Rights Act of 1957, as amended. Second, plaintiffs argue that the individual notarization requirement constitutes an unlawful "test or device" in violation of Title 42 U.S.C. § 1973b(a), a provision of the Voting Rights Act of 1965. Third, the plaintiffs contend that the enforcement of the individual notarization requirement is foreclos-

ed by § 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c, which prohibits covered states and political subdivisions, among which are Virginia and the City of Richmond, from enforcing voting procedures or requirements different from those in force prior to November 1, 1964, unless the change has been approved by the Attorney General of the United States. Fourth, plaintiffs contend that the individual notarization requirement is violative of the right to vote as guaranteed by the Fifteenth Amendment of the United States Constitution. Lastly, plaintiffs urge that the individual notarization requirement violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. The Court will address these contentions seriatim.

## I.

Section 1971 of the Civil Rights Act of 1957, as amended, limits the power of states and their political subdivisions to deny citizens the right to vote in any election, including a bond referendum election.[3] Section 1971(a)(2)(B) of that Act, which is relevant to this litigation, provides:

(2) No person acting under color of law shall—

.    .    .    .    .

(B) deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under state law to vote in such election  .  .  . .

Plaintiffs urge that the individual notarization requirement violates § 1971(a)(2)(B) because it is not material to determining whether those who signed the petition for a referendum were qualified under state law to vote in such a referendum.

Plaintiffs rely in part on the stipulated fact that each signer of the petitions in question represented to the person gathering signatures that he or she was a qualified voter of the City, and that the person gathering the signatures executed an affidavit for each page of signatures to the effect that he or she had personally witnessed the signing of such signatures. Plaintiffs especially emphasize the stipulated fact that the City Registrar, Alice Clarke Lynch, compared the names on the petitions with names on the City voter rolls, and certified to the Clerk of the Circuit Court that the petitions bore the names of more than 8,394 registered voters, the number required to obtain a referendum. Thus, plaintiffs argue, nothing further would be served by the requirement of individual notarization, since the City was able to determine that the petitions ". . . *bear names signed thereto in excess of 8,394 registered voters* . . ." (emphasis added). Since the requirement of individual notarization would in plaintiffs' view serve no purpose not already served by the method actually used by the persons gathering the signatures, plaintiffs conclude that the individual notarization requirement is immaterial, hence invalid under § 1971(a)(2)(B).

Plaintiffs' conclusion though made in good faith, is in the Court's view reached by specious reasoning. The most that advocates of plaintiffs' position can fairly contend is that the petitions contained signatures which matched the *names* of registered voters of the City of Richmond. Plaintiffs cannot claim with certainty that the persons who signed the petitions were in fact qualified voters. The Court must therefore reject plaintiffs' conclusion that the challenged requirement is immaterial.

■ In the Court's view, the requirement of individual notarization of each signature

---

**3.** The term "vote" is defined by 42 U.S.C. § 1971(e) to include ". . . all action necessary to make a vote effective including, but not limited to, registration or other action required by state law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to candidates for public office *propositions for which votes are received in an election.*" It is clear that the bond referendum sought by plaintiffs is a "propositions for which votes are received in an election" within the meaning of § 1971(e). [Emphasis added.]

on a petition seeking a referendum is material in several respects. First, the individual notarization requirement impresses upon the signers of the petitions the seriousness of the act of signing a petition for a referendum. Second, the individual notarization requirement dissuades non-qualified persons from signing the names of qualified voters by subjecting those who take the oath to potential criminal liability for perjury. Third, the requirement that each person signing the petition appear and make oath before a notary will often provide an additional, neutral witness to the signing, further aiding the City in discouraging and prosecuting fraud and misrepresentation. Thus, for all of the foregoing reasons, the individual notarization requirement affords material protection to each and every citizen of the City by assuring that the City will not be forced to undertake the substantial preparation and expense of conducting a referendum unless the requisite number of qualified City voters have actually signed the petitions, and have done so only after exercising due deliberation. In short, the individual notarization requirement protects the City and its citizens against both fraud and caprice. The method used by plaintiffs does not provide the City with equivalent protection. The Court therefore concludes that the individual notarization requirement is not immaterial, hence not in violation of 42 U.S.C. § 1971(a)(2)(B).

Plaintiffs contend, however, that the City's asserted interests in enforcing the individual notarization requirement are spurious. They base this argument on the fact that the procedure used by the persons circulating the bond referendum petitions was virtually identical to the procedure required by the City Charter for placing a City Council candidate's name on a general election ballot. Plaintiffs have, in their enthusiasm for their cause, failed to recognize that there are indeed valid and substantial reasons for stricter procedural requirements

for obtaining a bond referendum than for adding a candidate's name to a general election ballot. Here, plaintiffs seek a special unscheduled referendum on a single issue. The burden and expense of conducting such a referendum is vastly greater than the insignificant burden of adding a candidate's name to a general election ballot. Moreover, those seeking a referendum are doing so for purposes of testing or overturning the actions of their own elected representatives. Our system of government presupposes that valid acts of elected law making bodies will be left standing except in extraordinary circumstances and that the primary remedy for a dissatisfied electorate is to vote at the next election to replace those with whom they disagree. Thus the Court is satisfied that the City is acting in good faith by imposing more burdensome procedures for obtaining a referendum than for placing a candidate's name on an election ballot.[4]

## II.

Plaintiffs next argue that the individual notarization requirement is an unlawful "test or device" of the kind prohibited by § 4 of the Voting Rights Act of 1965, 42 U.S.C. § 1973b. That statute provides, in pertinent part:

(a) To assure that the right of citizens of the United States to vote is not denied or abridged on account of race or color, no citizen shall be denied the right to vote in any Federal, State, or local election because of his failure to comply with any test or device in any State . . .

.     .     .     .     .

(c) The phrase "test or device" shall mean any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any par-

---

**4.** The parties spent considerable time and effort debating whether or not 42 U.S.C. § 1971(a)(2)(B) can be invoked to invalidate voting practices which do not have the purpose or effect of racial discrimination. Because the Court has concluded that the challenged voting practice is material, and thus outside the scope of § 1971(a)(2)(B), it is unnecessary to decide whether § 1971(a)(2)(B) applies in the absence of racial discrimination.

ticular subject, (3) possess good moral character, or (4) *prove his qualifications by the voucher of registered voters or members of any other class.* [Emphasis added.]

Plaintiffs contend that the individual notarization requirement falls within the fourth category of prohibited tests and devices because it requires each person signing a petition to "prove his qualifications by the voucher of registered voters or members of any other class." On this basis, plaintiffs ask the Court to strike down the requirement.

■ Plaintiffs reason that the individual notarization procedure requires each person signing a petition to vouch that he is a qualified voter, and that this self-voucher is proscribed by § 1973b(c)(4). Such reasoning is untenable. No conceivable purpose would be served by prohibiting people from swearing under oath that they are qualified voters when they sign a petition which they are not eligible to sign unless they are qualified voters. Nor can it be said that the notary is vouching for those who sign the petitions. The notary merely administers an oath; he or she in no way vouches that the signer is a registered voter or requires the signer to produce proof that he is a registered voter.

■ The more logical explanation as to the meaning of the proscription against vouchers under § 1973b(c)(4) is that § 1973b(c)(4) was specifically directed at the so-called "supporting witness" requirement which had commonly been used to disenfranchise black voters in the South. A pertinent passage from the legislative history of § 1973b(c) reveals:

The voucher requirement has similarly been used to effect discrimination. Registrars have required Negroes, but not whites, to produce supporting witnesses to vouch for them . . . . Registrars have required Negroes to produce whites to vouch for them . . . and registrars have helped whites, but not Negroes, in obtaining supporting witnesses. [citations omitted.]

Joint Views of 12 Members of the [Senate] Judiciary Committee Relating to the Voting Rights Act of 1965, 89th Cong., 1st Sess., [1965] U.S.Code Cong. & Admin.News, pp. 2437, 2540, 2549–50. The Supreme Court of the United States has also discussed the categories of tests and devices proscribed by § 1973b(c). Speaking through the then Chief Justice Warren in the case of *South Carolina v. Katzenbach*, 383 U.S. 301, 312–13, 86 S.Ct. 803, 810, 15 L.Ed.2d 769 (1966), the Court stated:

White applicants for registration have often been excused altogether from the literacy and understanding tests or have been given fairly easy versions, have received extensive help from voting officials, and have been registered despite serious errors in their answers. Negroes, on the other hand, have typically been required to pass difficult versions of all the tests, without any outside assistance and without the slightest error. The good-morals requirement is so vague and subjective that it has constituted an open invitation to abuse at the hands of voting officials. *Negroes obliged to obtain vouchers from registered voters have found it virtually impossible to comply in areas where almost no Negroes are on the rolls.* [Footnotes omitted.] [Emphasis added.]

Thus, both the Congress and the Supreme Court have viewed the prohibition against vouchers as an attack on a specific, racially discriminatory voting registration requirement. The individual notarization requirement at issue in the instant case in no way resembles the voucher requirements prohibited by § 1973b(c)(4). The Court therefore is satisfied that the individual notarization requirement of the Richmond City Charter is not a "test or device" prohibited under the Voting Rights Act of 1965.

III.

■ Plaintiffs next contend that enforcement of the individual notarization requirement violates § 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c. That section prohibits covered states and political subdivisions from administering "any voting

qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964 . . . ," without first obtaining the approval of the Attorney General of the United States.[5] This provision is intended to require Federal approval even of very minor changes in voting standards, practices and procedures. *See Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). Plaintiffs contend that the City has violated this provision by failing to obtain the Attorney General's approval for what they contend is a change in the procedures governing the gathering of signatures for a referendum.

The essence of the plaintiffs' position is that in 1951 the City took formal action to permit the use of City fire engine houses as designated places for notaries to accept signatures on petitions for a referendum, whereas in 1977 the City Council did not give such permission. The City admits that it did not seek approval for this alleged change in procedure. Because it is stipulated that the 1951 referendum is the only bond referendum that has been held in Richmond since the adoption of the present City Charter in 1948, plaintiffs contend that the City Council's failure to authorize use of fire engine houses as places for notaries to accept signatures in 1977 constitutes an unauthorized change from procedures in force or effect as of November 1, 1964. This unauthorized change, plaintiffs reason, renders the individual notarization requirement unenforceable.

■ The Court disagrees. Even assuming that a change in the designated places for notaries to accept signatures constitutes a change in "procedure" within the purview of § 1973c, the plaintiffs' argument is logically deficient. The "procedure" used by the City in the 1951 referendum had two parts: first, persons circulating petitions requested in writing that certain fire engine houses be designated as places for notaries to accept signatures on the petition for referendum; then *based on such written request*, the Council of the City of Richmond made available its fire engine houses for the purpose requested.

The instant record is devoid of any evidence that in 1977 anyone requested that the City Council grant permission for the use of fire engine houses as places for notaries to accept signatures. Thus, if a procedure was indeed in existence, plaintiffs did not follow or utilize it. Because plaintiffs did not make the necessary request to trigger the 1951 "procedure" (as they characterize it), the Court has no evidence before it that the City would not have honored such a request in 1977. Thus, there is no evidence of any change in procedure regarding the fire engine houses, and no violation of 42 U.S.C. § 1973c.[6]

## IV.

Plaintiffs' next contention is that enforcement of the individual notarization re-

---

5. § 1973c also provides that covered states and political subdivisions, after receiving the approval of the Attorney General, may seek a declaratory judgment from the United States District Court for the District of Columbia that the new qualification, prerequisite, standard, procedure or practice does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color. Until such a declaratory judgment is entered, "no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure."

6. Plaintiff intervenors also argue that the City's failure to designate fire engine houses as places where notaries could accept signatures in 1977 constitutes an inconsistent practice or procedure in violation of 42 U.S.C. § 1971(a)(2)(A). That section provides:

> (a)(2) No person acting under color of law shall—
>
> (A) in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote.

The Court's finding that there was no change in procedure under 42 U.S.C. § 1973c, however, also compels a finding that there has been no different or inconsistent practice or procedure under 42 U.S.C. § 1971(a)(2)(A). Accordingly, the Court finds no violation of § 1971(a)(2)(A).

quirement violates the Fifteenth Amendment to the United States Constitution. The Fifteenth Amendment provides, in pertinent part:

> The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

■ The only factual basis for plaintiffs' Fifteenth Amendment argument is that the petition forms used by the persons gathering signatures for a referendum were official state forms supplied by the State Board of Elections to the City Registrar, who in turn supplied them to the referendum petitioners. These forms were not the proper forms for obtaining a bond referendum, however. Rather, they were the forms used to petition to place a candidate's name on a general election ballot. Plaintiffs contend that since the use of these official forms resulted in the disenfranchisement of numerous qualified black voters, the City violated the Fifteenth Amendment. Plaintiffs admitted at oral argument, however, that their diligent inquiry into the facts of this case has uncovered no evidence of racial discrimination on the part of City or State officials. Plaintiff intervenors also state in their brief that "it does not appear that any state or city officials acted in bad faith through the inadvertent use of the improper state petition form . . . ." Nor does the Court find any evidence in the record that any State or City official acted in a racially discriminatory manner, or that any qualified voter of the City was denied the opportunity to vote in a referendum "on account of race, color, or previous condition of servitude." Absent any such evidence of racial discrimination, plaintiffs' claim under the Fifteenth Amendment is in the Court's view without merit.[7]

## V.

■ Plaintiffs' final contention is that the individual notarization requirement violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The Equal Protection Clause provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." Without question, this clause applies to political subdivisions such as the City of Richmond. *Avery v. Midland County*, 390 U.S. 474, 480, 88 S.Ct. 1114, 1118, 20 L.Ed.2d 45 (1968).

The heart of plaintiffs' argument is that the individual notarization requirement has the practical effect of imposing a tax or penalty both on the right to petition and on the exercise of the rights necessary to vote in a referendum. Succinctly stated, plaintiffs contend that the individual notarization requirement is simply a poll tax in disguise and should therefore be struck down under the Equal Protection Clause.

There can be no doubt that a poll tax violates the Equal Protection Clause. In *Harper v. Virginia Board of Elections*, 383 U.S. 663, 666, 86 S.Ct. 1079, 1081, 16 L.Ed.2d 169 (1966), in striking down Virginia's poll tax, the Supreme Court stated unequivocally:

> We conclude that a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard. Voter qualifications have no relation to wealth nor to paying or not paying this or any other tax. [Footnote omitted.]

Plaintiffs' line of reasoning, however, has a second and more difficult step. Plaintiffs view the individual notarization requirement as the equivalent of a poll tax. They reason that since individual notarization is a

---

7. Plaintiffs rely exclusively on *United States v. Post*, 297 F.Supp. 46 (W.D.La.1969), which they cite for the proposition that the Fifteenth Amendment is violated whenever the acts of election officials result in the disenfranchisement of a substantial number of black voters, even in the absence of any evidence of bad faith or racially discriminatory intent. To the extent that *Post* stands for such a broad general proposition, this Court believes it to be incorrect and declines to follow it. Cf. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (proof of discriminatory purpose required to establish violation of Equal Protection Clause of Fourteenth Amendment).

prerequisite to obtaining a referendum, and since notaries are permitted to charge and in fact do charge in practice, that the notarization requirement is in effect a poll tax.

■ Plaintiffs' argument cannot succeed on the evidence before the Court. The essential link in plaintiffs' chain of reasoning is the assumption that all notaries charge for their services. But nothing in the record supports this assumption. At oral argument, plaintiffs admitted that the record is devoid of any evidence regarding notary fees. To fill this gap, plaintiffs asked the Court to take judicial notice that notaries do in fact charge for their services. The Court is unwilling to take and indeed could not properly take judicial notice of a fact so central to this litigation. Yet without proof that notaries always or nearly always charge a fee, plaintiffs cannot persuade the Court that the notarization requirement amounts to a poll tax. As long as it appears to the Court that avenues may be open by which those signing a bond referendum petition can have their signatures individually notarized without payment of a fee, the individual notarization requirement cannot be said to make "the affluence of the voter or payment of any fee an electoral standard." *Harper v. Virginia Board of Elections, supra.* Thus, in the Court's view, the individual notarization requirement does not run afoul of the Equal Protection Clause by causing an invidious discrimination on the basis of wealth.

The Court must still address plaintiffs' more general contention that the individual notarization requirement violates the Equal Protection Clause because it infringes upon the fundamental right to vote but is not supported by a compelling state interest and is not accomplished by the least restrictive means. The Court finds this argument problematic. At the outset, the Court is puzzled about the precise group or class of citizens which plaintiffs claim has suffered discrimination. Normally, voting rights cases have focused on a specific, identifiable class of citizens. *See, e. g., Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (independent candidates); *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (new residents); *Harper v. Virginia Board of Elections, supra* (poor people); *Carrington v. Rash,* 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) (servicemen). The present suit has no comparable focus. At best, the plaintiffs allege discrimination against qualified voters who desire a bond referendum. This strikes the Court as a dubious classification on which to base an equal protection analysis because the law which plaintiffs challenge applies equally to all citizens, without regard to race, religion, sex, wealth, military status, national origin, age, political affiliation, or any of the other sadly traditional fountainheads of unconstitutional discrimination. Nevertheless, because the class of qualified voters who desire a bond referendum resembles a class of qualified voters desiring to place the name of a small party candidate on an election ballot, the Court will accept the class of qualified voters who desire a bond referendum as a basis for analysis.

A second preliminary problem also troubles the Court. Plaintiffs contend that the individual notarization requirement must be analyzed under a compelling state interest test because it impinges on a fundamental right, the right to vote. Although the Court agrees that the right to vote may be characterized as fundamental, *see Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Supreme Court has never held that the right to obtain or vote in a referendum is fundamental. Indeed, the Supreme Court has recently indicated that the equal protection principles applicable to the right to vote in elections for legislative representatives cannot be mechanically applied in analyzing voter rights in a "single-shot" referendum. *See Lockport v. Citizens for Community Action,* 430 U.S. 259, 266, 97 S.Ct. 1047, 51 L.Ed.2d 313 (1977). This Court understands the Supreme Court to mean that a compelling state interest analysis may not be appropriate in analyzing equal protection challenges to referendum procedures.

Even if the Court assumes that the individual notarization requirement must satis-

fy a compelling state interest test, however, the plaintiffs cannot prevail. The notarial requirement serves two interests which the Court considers to be compelling. First, the City has a compelling interest in preventing electoral fraud. *See Dunn v. Blumstein,* 405 U.S. 330, 345, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). The requirement of individual notarization serves this interest by discouraging fraud, by giving the City a statutory basis for prosecuting fraud, and in many cases by providing an impartial witness (the notary) to aid in detecting and prosecuting fraud. Second, the City and all of its taxpayers have a compelling interest in discouraging unnecessary or capricious referenda. The notarial requirement serves this interest by making it relatively difficult for people to sign a bond referendum petition thoughtlessly or on impulse.

It is a separate question, though, whether the individual notarization requirement is in fact unduly burdensome in light of the City's objectives. The Court believes that the Supreme Court has already answered this question. In *American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974), the Supreme Court rejected an equal protection challenge to a Texas election law that required individual notarization of signatures on nominating petitions for small party candidates. In upholding this individual notarization requirement, the Court stated:

> The parties object to this requirement, but make little or no effort to demonstrate its impracticability or that it is unusually burdensome. The District Court determined that it was not, indicating that one of the plaintiff political parties had conceded as much. The District Court also found no alternative if the State was to be able to enforce its laws to prevent voters from crossing over or from voting twice for the same office. On the record before us, we are in no position to disagree.

415 U.S. at 787, 94 S.Ct. at 1309. Plaintiffs here stand on no better footing. They object to the individual notarization requirement, "but make little or no effort to demonstrate its impracticability or that it is unusually burdensome." As already noted, there is no evidence in the record to indicate that notary fees are burdensomely high or that free notary services are not available. More importantly, because plaintiffs did not even attempt compliance with the individual notarization requirement, they have no experience which might enlighten the Court in determining the degree of the burden imposed by the requirement. The only relevant evidence before the Court is that just as two of the original party plaintiffs in *American Party of Texas v. White* were able to satisfy Texas's individual notarization requirement, 415 U.S. at 787, 94 S.Ct. at 1309, so persons gathering signatures for the bond referendum held in Richmond in 1951 were able to comply with the same individual notarization requirement here challenged. These lessons from experience satisfy the Court that the failure to comply with the individual notarizations in the instant case cannot reasonably be attributed to an unusually burdensome or impracticable requirement. Indeed, all political ventures require effort. As the Supreme Court stated in *American Party of Texas v. White, supra* at 787, 94 S.Ct. at 1309:

> Hard work and sacrifice by dedicated volunteers are the lifeblood of any political organization. Constitutional adjudication and common sense are not at war with each other, and we are thus unimpressed with arguments that burdens like those imposed by Texas are too onerous, especially where two of the original party plaintiffs themselves satisfied these requirements. [Footnote omitted.]

Common sense commands a similar conclusion here.[8]

---

8. Plaintiff intervenors urge that the Court should follow *Jenness v. Fortson,* 403 U.S. 431, 438-39, 91 S.Ct. 1970, 1974, 29 L.Ed.2d 554 (1971), which suggested in dicta that a requirement of individual notarization on a nominating petition—and thus on a referendum petition—is a "suffocating restriction" which violates the Equal Protection Clause. The Court's statement in *Jenness,* in the context in which it was made, is of little precedential value. This

The only alternative which plaintiffs suggest to the present requirement is the procedure which they followed in the instant case, as set out in the stipulation of facts. In the Court's view, such a procedure does not adequately protect the City's vital interests in preventing fraud and discouraging unnecessary referenda because it includes no element which impresses upon potential signers, whether legitimate or fraudulent, that the act of signing is a serious and significant act which deserves careful deliberation. Since plaintiffs have suggested no other procedure which would adequately serve the City's interests without a requirement of individual notarization, the Court cannot conclude that the challenged requirement is unnecessary to accomplish the City's objectives.

In summary, the Court is satisfied on the record before it that the individual notarization requirement is a constitutionally valid measure "reasonably taken in pursuit of vital state objectives that cannot be served equally well in significantly less burdensome ways." *American Party of Texas v. White, supra* at 781, 94 S.Ct. at 1306. The Court therefore concludes that the requirement does not violate the Equal Protection Clause.

## VI.

As part of their answer, defendants filed a counterclaim seeking "a Declaratory Judgment that in addition to the matters set forth in the Complaint, there are no other federal law impediments of any kind whatsoever, including, but not limited to, the Fifteenth Amendment to the United States Constitution, restricting the sale of the bonds." At oral argument, counsel for defendants advised the Court that they had abandoned that prayer. Additionally, no authority has been cited upon which the Court could base such a broad declaratory judgment. In any event, the Court considers it inappropriate and unnecessary to adjudicate claims not now before it.

is especially so in view of the Court's opinion in *American Party of Texas v. White, supra*, a case which directly confronts the issue of indi-

## VII.

In conclusion, for the reasons heretofore stated, the Court finds that the City Charter's individual notarization requirement does not violate any of the provisions of Federal statutory or constitutional law asserted by plaintiffs and plaintiff intervenors. Summary judgment in favor of the defendants is therefore appropriate.

vidual notarization and which postdates *Jenness* by nearly three years.