**LIBERTARIAN PARTY OF VIRGINIA; Marguerite Wagner; Dallas Cooley, M.D.; Henry Thrasher; Scott Bowden; Jim Elwood; Alvin Anders, Appellants,**

v.

**Earl DAVIS, Chairman State Board of Elections; A. George Cook, 3rd Vice Chairman, State Board of Elections; Susan Fitz-Hugh, Secretary State Board of Elections, Appellees.**

No. 84–2071.

United States Court of Appeals, Fourth Circuit.

Argued May 8, 1985.

Decided July 8, 1985.

Rehearing and Rehearing In Banc Denied Aug. 8, 1985.

James J. Featherstone, Washington, D.C. (Santarelli & Bond; Richard E. Gardiner, Washington, D.C., on brief), for appellants.

William J. Bridge, Asst. Atty. Gen., Richmond, Va. (Gerald L. Baliles, Atty. Gen., Richmond, Va., on brief), for appellees.

Before RUSSELL and SPROUSE, Circuit Judges, and KNAPP, Senior United States District Judge, for the Southern District of West Virginia, sitting by designation.

SPROUSE, Circuit Judge:

Under Virginia election laws, a political organization not qualifying as a "political party" must petition to secure a place on the Virginia ballot for its presidential and vice-presidential nominees. The petition must be signed by one-half of one percent of all registered voters, including at least two hundred voters from each congressional district, and each signature must be witnessed and attested by a qualified voter from the same congressional district as the petition signer.[1] The Libertarian Party of Virginia appeals from the district court's Fed.R.Civ.P. 12(b)(6) dismissal of its action challenging the constitutionali-

---

1. Va.Code § 24.1–159 (1980) provides in pertinent part:

§ 24.1–159. How other groups may submit names of electors.—Any group of qualified voters of not less than the number equal to one half of one per centum of the qualified voters in the Commonwealth as of the first day of January of that year, not constituting a political party as defined in § 24.1–1, may have the names of electors selected by them, including one elector residing in each congressional district and two from the Commonwealth at large, printed upon the official ballot to be used in the election of electors for President and Vice-President by filing a petition so requesting with the State Board of Elections not later than noon of the sixtieth day before said election. Said petition, which shall be signed by said voters, contain their residence addresses, the signatures to which shall be witnessed by a qualified voter whose affidavit to that effect is attached to said petition, shall set forth the names of the electors selected by such voters, the party name under which they desire the electors so selected to be listed on the ballot, and the names of the candidates for President and Vice-President for whom such electors are expected to vote in the Electoral College.

ty of this provision, 591 F.Supp. 1561. We affirm.

■ The Libertarian Party, which has been in existence since 1980, does not constitute a "political party" because it did not poll 10% of the vote in the immediately preceding statewide election as required by the state statutory definition.[2] Consequently, access to the ballot for electors of the Party was limited to the avenue provided by § 24.1–159. In its section 1983[3] declaratory and injunctive action against the Virginia State Board of Elections (Board) the Libertarian Party asserts that the requirements of § 24.1–159 violate rights protected by the first and fourteenth amendments to the United States Constitution. The Libertarian Party below and on appeal attacked the provisions requiring (1) that the petition include the signatures of at least 200 qualified voters from each congressional district (the distribution requirement), and (2) that the signatures be witnessed and attested by a qualified voter from the same congressional district as the qualified voter signing the petition (the witness requirement). In other words, its principal argument is that requiring petition signatures to be witnessed and obtained distributively trangresses constitutional boundaries recently established in this first and fourteenth amendment area. We disagree and affirm the action of the district court.

It is abundantly clear that we must ensure that ballot access restrictions do not infringe two fundamental constitutional rights—the right to associate for the advancement of political beliefs and the right of qualified voters to cast their votes effectively. *Illinois State Board of Elections*

*v. Socialist Workers Party,* 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979). As the Supreme Court has announced with equal clarity, however, elections properly must be regulated "if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974).

This creates an obvious tension which the Supreme Court has recognized. In *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), the Court articulated a balancing test to resolve challenges to a state's ballot access requirements:

> [A] court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is constitutional.

460 U.S. at 789, 103 S.Ct. at 1570.[4]

■ Applying the *Anderson* test to the Party's challenge to the distribution re-

---

**2.** Va.Code § 24.1–1 (1980) defines a "political party" as

an organization or affiliation of citizens of the Commonwealth which, at the last preceding statewide general election, polled at least ten percent of the total vote cast for the office filled in that election by the voters of the Commonwealth at large. Such organization or affiliation of citizens shall also have a State central committee and a duly elected chairman which have continually been in existence

and holding office for the six months preceding the filing of a nominee.

**3.** 42 U.S.C. § 1983 (1982).

**4.** The Court also has declared that in reviewing statutes that impose signature requirements as a prerequisite to placement on a state's ballot, the focal point of our inquiry is whether a "reasonably diligent ... candidate [can] be expected to satisfy the signature requirements." *Storer v. Brown,* 415 U.S. 724, 742, 94 S.Ct. 1274, 1285, 39 L.Ed.2d 714 (1974).

quirement of § 24.1–159, the balance weighs significantly in favor of Virginia's right to regulate access to its ballot in this limited manner. In terms of pure numbers, 0.5% of the qualified voters, the statute requires only a nominal demonstration of support in order to place a candidate's name on the ballot. This requirement is one of the least burdensome in the nation. *See generally* Note, *Developments in the Law—Elections*, 88 Harv.L.Rev. 1111, 1124 n. 11 (1975). The Party argues, however, that the requirement that a political organization submit a petition including the signatures of at least 200 qualified voters from each of Virginia's ten congressional districts results in unconstitutional vote dilution and cannot be justified by any legitimate state interests. While the Supreme Court has recognized that a state may not implement an electoral scheme that debases or dilutes the weight of a citizen's vote, *Moore v. Ogilvie*, 394 U.S. 814, 818, 89 S.Ct. 1493, 1495, 23 L.Ed.2d 1 (1969), in our view the distribution requirement of § 24.-1–159 does not possess such impact and moreover advances important state interests.

In the first place, Virginia law requires that congressional districts be apportioned in such a way as to contain, as nearly as practicable, an equal number of inhabitants. *Wilkins v. Davis*, 205 Va. 803, 139 S.E.2d 849 (1965). We are thus not faced with a statutory scheme based on unequal voter apportionment such as those which have come under close constitutional scrutiny. *See, e.g., Moore v. Ogilvie*, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969) (overturning Illinois scheme requiring signatures of 200 voters from each of at least 50 counties where evidence showed that 93.4% of voters resided in 49 most populous counties while 6.6% resided in remaining 53 counties); *Blomquist v. Thomson*, 739 F.2d 525 (10th Cir.1984) (striking down Wyoming requirement that new political party submit signatures of 8,000 voters, the majority of whom did not reside in same county, on grounds that requirement discriminated against residents in more populated counties); *Communist Party v. State*

*Board of Elections*, 518 F.2d 517 (7th Cir.), *cert. denied*, 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975) (Illinois statute requiring 25,000 voter signatures, not more than 13,000 of which from any one county, held invalid as unconstitutionally diluting voting power of citizens residing in populous counties), *Libertarian Party of Nebraska v. Beermann*, 598 F.Supp. 57 (D.Neb.1984) (state statute requiring signatures from each county held unconstitutional). Va. Code § 24.1–159, in stark contrast to the enactments considered in the above decisions, operates evenhandedly and does not allow voters from one district to control access to the state's ballot.

The Virginia statute also promotes important state interests. The requirement that a political organization or candidate exhibit a "significant modicum of support" before being granted a place on the state's ballot serves the legitimate state interest of avoiding "confusion, deception, and even frustration of the democratic process at the general election." *Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971). Moreover, the states "have important interests in protecting the integrity of their political processes from frivolous or fraudulent candidacies, in ensuring that their election processes are efficient, in avoiding voter confusion caused by an overcrowded ballot, and in avoiding the expense and burden of run-off elections." *Clements v. Fashing*, 457 U.S. 957, 965, 102 S.Ct. 2836, 2844, 73 L.Ed.2d 508 (1982). Section 24.1–159, when viewed in full, comports with these state concerns and does not unfairly or unnecessarily burden "the availability of political opportunity." *Anderson v. Celebrezze, supra*, 460 U.S. at 793, 103 S.Ct. at 1572. As noted, the requirement of a petition signed by 0.5% of eligible voters is a minimal impediment. Moreover, Virginia imposes no disaffiliation requirement on those voters who sign petitions, nor does the state demand that those voters actually vote for Libertarian Party candidates in the general election. The deadline for filing petitions, sixty days before the election, is among the most gener-

ous in the nation. *See Anderson v. Celebrezze,* 460 U.S. 780, 795 n. 20, 103 S.Ct. 1564, 1573 n. 20, 75 L.Ed.2d 547 (1983). The time alloted to procure signatures, eight months in this case, substantially exceeds periods previously held permissible. *See Jenness v. Fortson,* 403 U.S. at 433, 91 S.Ct. at 1971 (180 days); *Storer v. Brown,* 415 U.S. at 739–40, 94 S.Ct. at 1283–84 (24 days); *American Party of Texas v. White,* 415 U.S. 767, 786, 94 S.Ct. 1296, 1308, 39 L.Ed.2d 744 (55 days).

Although not determinative, it is significant that the Virginia statutory scheme compares favorably with other similar state statutory designs examined both before and after *Anderson.* In *Udall v. Bowen,* 419 F.Supp. 746 (S.D.Ind.), *aff'd mem* 425 U.S. 947, 96 S.Ct. 1720, 48 L.Ed.2d 191 (1976), the district court upheld an Indiana statute requiring candidates who desired to appear on the state's presidential preference primary ballot to submit petitions bearing the signatures of at least 5,500 registered voters, with a minimum of 500 signatures from each of the state's eleven congressional districts. The district court concluded that "the minimal regulation imposed by the statute is reasonable in degree, protects valid state interests, and is constitutional." 419 F.Supp. at 749.

In *Libertarian Party v. Bond,* 596 F.Supp. 719 (E.D.Mo.1984), the district court was confronted with a Missouri statute that conditioned ballot access on either submitting signatures from each congressional district totalling 1% of the total votes cast in the state's last general gubernatorial election or from one-half of the congressional districts equal to 2% of the total votes cast in the state's last gubernatorial election. As a practical matter, the statute required that the Libertarian Party procure between 4,266 and 5,348 signatures from each of five congressional districts in order to comply with the 2% requirement. Re-

jecting the contention that the reasoning in *Udall* was not controlling because Missouri required five times as many signatures as did Indiana, the court held that "the principle remains that geographical signature prerequisites are not a constitutional bar in ballot qualification cases." 596 F.Supp. at 724.[5]

In view of the indulgent nature of Virginia's ballot access scheme, the distribution requirement is both reasonable and nondiscriminatory and is justified by the recognized state interest in protecting the electoral process from the undue burden posed by frivolous candidates and insincere ballot cluttering. *Anderson v. Celebrezze, supra* 460 U.S. at 788, 103 S.Ct. at 1569.

The Party next attacks the witness portion of § 24.1–159. This provision dictates that each signature on the petition be witnessed and attested by a qualified voter from the same congressional district as the petition signer. The Party contends that the witness requirement violates first amendment rights by unduly burdening the right to associate and does not serve compelling state interests. We disagree.

Virginia's interest in preventing election fraud by assuring the genuineness of signatures as a basis for imposing a notarization requirement for citizens signing a bond referendum was recognized in *Howlette v. City of Richmond,* 485 F.Supp. 17 (E.D.Va.), *aff'd,* 580 F.2d 704 (4th Cir.1978). We find Judge Merhige's reasoning there to be equally compelling in this case. *See also Libertarian Party of Nebraska v. Beermann,* 598 F.Supp. 57, 60 (D.Neb. 1984); *Johnson v. Cuomo,* 595 F.Supp. 1126, 1130 (N.D.N.Y.1984). We also agree with the district court's rationale in the instant case that the requirement that the witness be from the same congressional district as the petition signer serves the important purpose of assuring "some indi-

---

**5.** In *Libertarian Party of Nebraska v. Beermann,* 598 F.Supp. 57 (D.Neb.1984), Judge Van Pelt noted:

It appears to this Court that the most equitable means of assuring that the petitioning candidate or party demonstrate the necessary evidence of statewide support without unduly burdening such party would be to require that the petitions be signed by a percent of the voters in each congressional district.
598 F.Supp. at 63.

cation of geographic as well as numerical support" by demonstrating "that within each congressional district there is at least one 'activist' sufficiently motivated to shoulder the burden of witnessing signatures." *Libertarian Party of Virginia v. Davis*, 591 F.Supp. at 1564. It is difficult to imagine how the state could accomplish these objectives by less restrictive means. The statute does not limit the number of signatures that an individual may witness nor does it require that witnesses be members of the Libertarian Party.

For the foregoing reasons, the decision of the district court is affirmed.

AFFIRMED.