**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

PAUL F. KENDALL,

        *Plaintiff-Appellant,*

        v.

ANN M. BALCERZAK, President, Howard County Board of Elections; BETTY L. NORDAAS, Director, Howard County Board of Elections; ROBERT L. WALKER, Chairman, Maryland State Board of Elections; LINDA H. LAMONE, State Administrator, Maryland State Board of Elections,

No. 09-2304

        *Defendants-Appellees,*

        and

HOWARD COUNTY BOARD OF ELECTIONS; MARYLAND STATE BOARD OF ELECTIONS,

        *Defendants.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(1:09-cv-00660-JFM)

Argued: December 9, 2010

Decided: March 28, 2011

Before AGEE and WYNN, Circuit Judges,
and Patrick Michael DUFFY, Senior United States District
Judge for the District of South Carolina, sitting by
designation.

Affirmed by published opinion. Senior Judge Duffy wrote the
opinion, in which Judge Agee and Judge Wynn joined.

## COUNSEL

**ARGUED:** Susan Baker Gray, Highland, Maryland, for
Appellant. Kathleen Evelyn Wherthey, OFFICE OF THE
ATTORNEY GENERAL OF MARYLAND, Baltimore,
Maryland; Gerald M. Richman, Ellicott City, Maryland, for
Appellees. **ON BRIEF:** Douglas F. Gansler, Attorney Gen-
eral of Maryland, Baltimore, Maryland, Sandra Benson Brant-
ley, Assistant Attorney General, OFFICE OF THE
ATTORNEY GENERAL OF MARYLAND, Annapolis,
Maryland, for Appellees Robert L. Walker and Linda H.
Lamone.

## OPINION

DUFFY, Senior District Judge:

This appeal arises out of a petition drive to obtain a referen-
dum on a zoning ordinance passed by the Howard County
Council, of Howard County, Maryland, on November 3,
2008. Paul F. Kendall, who signed the petition, filed a com-
plaint on March 16, 2009, and an amended complaint on
March 30, 2009, in the United States District Court for the
District of Maryland, pursuant to 42 U.S.C. § 1983, alleging
violations of his constitutional rights and demanding declara-

tory and injunctive relief. The named Defendants were: Howard County, Maryland (the "County"), President Ann M. Balcerzak and Director Betty L. Nordaas of the Howard County Board of Elections (the "County Board Defendants"), and Chairman Robert L. Walker and Administrator Linda H. Lamone of the Maryland State Board of Elections (the "State Defendants").

Kendall's amended complaint asserted three counts against the Defendants. In the first count, Kendall asserted that all Defendants had denied his rights to freely associate, petition the government, and vote, in violation of the First and Fourteenth Amendments of the United States Constitution. The second count asserted that all the Defendants had denied him due process and equal protection in violation of the Fourteenth Amendment of the United States Constitution. The third count alleged that all Defendants had violated Kendall's constitutional rights that are protected under 42 U.S.C. § 1983.

The County and the County Board Defendants moved to dismiss Kendall's amended complaint, and the State Defendants filed an answer asserting that the complaint failed to state a claim against them upon which relief could be granted. The district court subsequently granted the motions of the County and the County Board Defendants and dismissed the case against all Defendants. J.A. 117-35.

Kendall noted an appeal on November 17, 2009. On December 23, 2009, all parties participated in court-ordered mediation, which led to Kendall's voluntary dismissal of his claims against the County effective January 15, 2010, but which otherwise failed to resolve the dispute. This appeal followed.

As explained below, we agree that the district court properly dismissed Kendall's complaint. We therefore affirm the district court's dismissal.

I.

On November 3, 2008, the Howard County Council passed Council Bill 58, a bill that substantially increased the size of a grocery store to be built in the Turf Valley community. Concerned with the passage of this bill, Howard County Citizens for Open Government ("HCCOG") sought to challenge this bill by way of referendum, as permitted by Howard County Charter Section 211. Specifically, Section 211 of the Howard County Charter provides, in relevant part:

(a) Scope of the referendum

The people of Howard County reserve to themselves the power known as "the Referendum," by petition to have submitted to the registered voters of the County to approve or reject at the polls, any law or part of any law of the Council. The referendum petition . . . shall be sufficient if signed by five per centum of the registered voters of the County, but in any case not less than 1,500 or more than 5,000 signatures shall be required. Such petition shall be filed with the Board of Supervisors of Election of Howard County within sixty days after the law is enacted. . . . [I]f more than one-half, but less than the full number of signatures required to complete any referendum petition against such law be filed within sixty days from the date it is enacted, the time for the law to take effect and the time for filing the remainder of signatures to complete the petition shall be extended for an additional thirty days.

Howard County, Md., Charter § 211 (2008).

In Howard County, the signatures of 5,000 registered voters are generally needed to refer a legislative act of the County Council to referendum; in this case, the deadline for gathering

a minimum of 2,500 signatures in order to secure an extension of thirty days was January 3, 2009.

The Election Law Article of the Maryland Code sets forth the requirements for a valid referendum petition in Maryland, stating, in pertinent part:

> (a) Generally— To sign a [referendum] petition, an individual shall:
>
>> (1) sign the individual's name as it appears on the statewide voter registration list or the individual's surname of registration and at least one full given name and the initials of any other names; and
>>
>> (2) include the following information, printed or typed, in the spaces provided;
>>
>>> (i)  the signer's name as it was signed;
>>>
>>> (ii)  the signer's address;
>>>
>>> (iii)  the date of signing; and
>>>
>>> (iv)  other information required by the regulations adopted by the State Board.
>
> (b) Validation and counting— The signature of an individual shall be validated and counted if:
>
>> (1) the requirements of subsection (a) of this section have been satisfied....

Md. Code Ann., Election Law ("EL") § 6-203 (West 2010).

On December 19, 2008, the Court of Appeals of Maryland issued a decision, *Doe v. Montgomery Cnty Bd. of Elections*,

962 A.2d 342 (Md. 2008), interpreting EL § 6-203. The court in *Doe* held:

> The plain meaning of the words "shall " and "requirements" in Section 6-203 reflect that the statutory provisions require that the voter must sign his or her name "as it appears on the statewide voter registration lists or the individual's surname of registration and at least one full given name and the initials of any other names"; the provisions are mandatory, not suggestive.

*Doe,* 962 A.2d at 360 (quoting EL § 6-203).

On November 17 and 19, 2008, HCCOG filed requests with the Board of Elections seeking an advance determination regarding the sufficiency of the proposed referendum petition language and signature sheet. On December 1, 2008, the County Board determined that the proposed petition complied with the requirements of state law, regulations, and the Howard County Charter and Code. Once approved, HCCOG began to collect the necessary petition signatures on the approved petition forms.

On December 30, 2008, twelve days after the Maryland Court of Appeals decided *Doe,* HCCOG presented the County Board with 3,301 signatures, which exceeded the 2,500 signatures needed by January 3, 2009 in order to obtain the Charter-authorized thirty-day extension to secure the remaining signatures. *See* Howard County, Md. Charter § 211 (2008).

On January 22, 2009, the County Board validated and certified 2,603 of the signatures that HCCOG had submitted, and gave them an additional thirty days, until February 4, 2009, to finish collecting the required 5,000 signatures. On February 3, 2009, HCCOG presented the County Board with an additional 6,079 signatures.

On February 12, 2009, the County Board issued a letter stating that it had stopped reviewing the additional signatures due to a pending legal challenge, filed by a third party, on February 4, 2009, which was unrelated to the Board's signature validation methods. On March 11, 2009, counsel for the County Board sent an email to several persons involved in the referendum process requesting their presence at a meeting of the County Board the following evening.

At the March 12, 2009 meeting of the County Board, the Board's president, Ms. Balcerzak, announced that the Board was reversing its January 22, 2009 decision to certify the first 2,603 signatures on the petition based upon the decision of the Court of Appeals of Maryland in *Doe.* In reliance on *Doe,* the Board conducted a second review of a statistically valid sample of 1,216 signatures from the initial 3,301 submitted. After invalidating 1,052 signatures, a rejection rate of eighty-seven percent, the Board concluded that HCCOG failed to submit the requisite number of valid signatures, and would therefore be denied an extension of time to submit the 5,000 total signatures required to place the referendum on the ballot. As Nordaas explained in the final County Board determination letter to HCCOG's counsel dated March 12, 2009:

> [T]he Board of Elections found, after review of each signature on submitted local referendum petitions, that it did not validate each signature in accordance with the mandate set forth in *Doe* which requires an individual *to sign his/her name as it appears on the statewide voter registration or place his/her surname of registration and at least one full given name and the initials of any other names.*

> J.A. 45.

Nordaas stated that the Board's decision to re-verify the signatures in the HCCOG's petition was based on March 11, 2009 advice from the Maryland Attorney General's office. *Id.*

Four days after the March 12, 2009 County Board meeting, Kendall filed his initial complaint in this action, in the United States District for the District of Maryland. On March 30, 2009, he filed an amended complaint, which is the operative pleading in this action.

In Count One of the First Amended Complaint, Kendall claimed that the actions of Defendants "in interpreting the signature requirements as they did," totally and completely disenfranchised Plaintiff and over 9,300 other signatories of the petition as well as the entire Howard County electorate of their right to take Bill 58 to referendum and vote. Kendall claimed that Defendants violated his (a) "First Amendment right to express his beliefs by vote, to associate as these rights are made applicable to Howard County by the Fourteenth Amendment to the United States Constitution"; (b) "right to substantive due process and equal protection as established by the Fourteenth Amendment to the United States Constitution . . ."; and (c) "right to petition the government for redress of grievances as protected under the First and Fourteenth Amendments to the United States Constitution." J.A. 12. Kendall further pled that the requirement that signatures on a referendum petition match exactly the names as written on the voter registration card is "overbroad" and represents an unreasonable burden on Plaintiff's rights to vote, petition, associate and engage in politically protected speech. J.A. 13.

In Count Two, Kendall claimed that he was denied equal protection and procedural and substantive due process. Specifically, Kendall argued that the procedural due process offered by the County Board was "insufficient" in that no notice was given of the reversal of the Board's decision and there was no ability to challenge that decision before it took effect. J.A. 17. Kendall's substantive due process argument appears to be that the process was "unfair" in that it applied "an unconstitutional law and a non-precedential portion of a Court of Appeals decision to achieve a manifestly unfair

result" which denied Plaintiff his First and Fourteenth Amendment rights.

Count Three ("Violations of Constitutional Rights Protected Under 42 U.S.C. § 1983") appears to be nothing more than Plaintiff's rearticulation of the alleged violations of his First and Fourteenth Amendment rights.

All Defendants asserted, in response to Kendall's amended complaint, that it failed to state a claim upon which relief could be granted. The State Defendants did so by affirmative defense in their answer, whereas the County and the County Board Defendants did so by separate motions to dismiss.

## II.

On October 20, 2009, the district court issued an order dismissing Kendall's amended complaint as against all defendants pursuant to Federal Rule of Civil Procedure 12(b)(6). The court initially addressed the first and third counts, which together asserted violations of 42 U.S.C. § 1983 in the form of alleged denials of Kendall's First and Fourteenth Amendment rights. The court reasoned that a plaintiff pursuing a Section 1983 claim must first plead that the defendants unlawfully deprived him of a right secured by the Constitution and laws of the United States. J.A. 122. The court ruled that federal law does secure, in a limited sense, the right to referendum. J.A. 123-25. Whereas the right to vote is fundamental, the court reasoned, the State-conferred privilege to undertake ballot initiatives and referenda is not.* J.A. 123-24. Thus, while the right to referendum enjoys some protection

---

*"The term 'initiative' refers to a political procedure whereby citizens may propose laws and enact or reject the same at the polls." *Wright v. Mahan,* 478 F. Supp. 468, 469 n.1 (E.D. Va. 1979), *aff'd without op.,* 620 F.2d 296 (4th Cir. 1980). "The term 'referendum' refers to a procedure whereby citizens may approve or reject at the polls any act of the legislative body, in some instances only if specifically referred to the people by the legislature." *Id.*

under the First Amendment as applied to the States through the Fourteenth Amendment, the right also is permissibly subject to non-discriminatory, content-neutral limitations. J.A. 126. The court concluded that EL § 6-203, as construed in *Doe* and applied to Kendall, contained only non-discriminatory, content-neutral regulations, and that the statute imposed no unconstitutional restraints on Kendall's ability to petition for referendum. J.A. 127-28.

In addressing counts one and three of Kendall's amended complaint, the district court found instructive the analysis of the Sixth Circuit in *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291 (6th Cir. 1993). In that case, voters whose initiative petition was denied certification for submission after a large number of signatures were disqualified by the Board of State Canvassers due to statutory deficiencies filed an action under 42 U.S.C. § 1983 alleging that the state had deprived them of their First and Fourteenth Amendment rights. *Id.* at 293-94. The court first addressed the plaintiffs' contention that Michigan's procedures denied them the right to vote by excluding the signatures of some registered voters only because "technical checks" showed a failure to comply with Michigan initiative law. *Id.* at 296. An example of a signature eliminated by the procedures was a signature which was not accompanied, as required, by the signer's complete home address. *Id.* at 293. The court concluded that the plaintiffs had not demonstrated a violation of the right to vote as the court could identify no decision of the Supreme Court or a lower federal court holding that signing a petition to initiate legislation is entitled to the same protection as exercising the right to vote. *Id.*

The court then concluded that the plaintiffs' rights to free speech and political association also had not been violated. "Because the right to initiate legislation is a wholly state-created right, we believe that the state may constitutionally place nondiscriminatory, content-neutral limitations on the plaintiffs' ability to initiate legislation." *Id.* at 297. The Sixth

Circuit Court of Appeals found that the challenged Michigan procedure "does nothing more than impose nondiscriminatory, content-neutral restrictions on the plaintiffs' ability to use the initiative procedure that serve Michigan's interest in maintaining the integrity of its initiative process." *Id.*

The district court relied on the analysis in *Taxpayers United* to find that "[s]imilarly, here, for the same reasons cited by the *[Taxpayers United]* court, Plaintiff has not demonstrated a violation of the right to vote. As for Plaintiff's claims that his right to engage in politically protected speech, right to petition, and right to associate were denied, I must determine whether the challenged statute, as applied to Plaintiff, imposes anything other than 'nondiscriminatory, content-neutral limitations' on Plaintiff's right to referendum. . . . I find that Section 6-203, as interpreted by the Maryland Court of Appeals, is, in fact, non-discriminatory and content-neutral." J.A. 125-27.

After concluding that dismissal was appropriate as to Kendall's First Amendment, Fourteenth Amendment, and Section 1983 claims, the court also found dismissal appropriate as to his remaining claims that the Defendants had denied him equal protection of the laws, substantive due process, and procedural due process. The court found no denial of equal protection, because EL § 6-203 relies on no suspect classification, and a rational basis exists for the statute's distinction between validatable and invalidatable referendum petition signatures. J.A. 128-29. The court also found no violation of substantive due process because, again, no fundamental right was at stake. J.A. 129. Finally, the court found that the procedural protections that the Maryland statutory scheme affords, including, in particular, the right to petition for judicial review from adverse action by the local election board, satisfied Kendall's right to procedural due process. J.A. 130-33.

### III.

We now review whether the district court properly dismissed Kendall's amended complaint and correctly ruled that EL § 6-203, as interpreted by *Doe,* imposes constitutionally permissible limitations on the right to referendum. "The standard of review for dismissal pursuant to Rule 12(b)(6) is *de novo.*" *Robinson v. Am. Honda Motor Corp., Inc.,* 551 F.3d 218, 222 (4th Cir. 2009). In addressing the matters on which a district court rules, the usual appellate standard governing motions to dismiss considers questions of law *de novo* and construes the evidence in the light most favorable to the non-moving party, applying the same criteria that bound the lower court. *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir. 1993); *EEOC v. Seafarers Intern. Union,* 394 F.3d 197 (4th Cir. 2005). To survive a rule 12(b)(6) motion to dismiss, the facts alleged "must be enough to raise a right to relief above the speculative level" and must provide "enough facts to state a claim to relief that is plausible on its face." *Robinson,* 551 F.3d at 222 (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007)).

### IV.

We find that the district court correctly ruled that EL § 6-203 does not violate Kendall's right to freely associate, his right to petition the government, his right to vote, or his First Amendment right to engage in "politically protected speech."

To begin with, Kendall argues that the right to referendum implicates the right to vote. We agree with the district court's conclusion that there is no fundamental right to initiate legislation as there is a fundamental right to vote. Kendall argues that the district court erred in finding that the right of referenda does not implicate the right to vote and argues that this case implicates the right to vote and that such right is violated in this case.

This case is not a right to vote case. We find the case of *Taxpayers United,* 994 F.2d 291, 296 (6th Cir. 1993), to be instructive on this issue. As summarized above, in *Taxpayers United,* the Sixth Circuit Court of Appeals held that Michigan's procedures for checking signatures on initiative petitions did not deny voters' right to vote, as signing a petition to initiate legislation was not entitled to the same protection as exercising the right to vote. As in *Taxpayers United,* in this case, Kendall does not cite to us nor does our research identify any decision of the Supreme Court holding that signing a petition to initiate legislation is entitled to the same protection as exercising the right to vote.

The basis for distinguishing the right to vote in a representative election, on the one hand, from the right to petition for referendum and initiative, on the other, is a sound one. The referendum is a form of direct democracy and is not compelled by the Federal Constitution. *See Doe v. Reed,* 130 S.Ct. 2811, 2817 (2010) (Sotomayor, J., concurring); *Kelly v. Macon-Bibb Cnty. Bd. of Elections,* 608 F. Supp. 1036, 1038 (M.D. Ga. 1985). In *Kelly,* county residents brought an action challenging the constitutionality of a county board of election's construction of a subsection of a Georgia statute allowing a political subdivision to remove itself, by local referendum, from a requirement of having its public water supply fluoridated so as to require a petition to call a referendum to be signed by ten percent of the registered voters who voted in the last general election. *Kelly,* 608 F. Supp. at 1038. The District Court for the Middle District of Georgia held that this case was "*not* a 'right to vote' case; referenda, unlike general elections for a representative form of government, are not constitutionally compelled." *Id.* The *Kelly* court went on to find that the petition requirement did not violate the Fourteenth Amendment given the permissible state purpose of ensuring that the expense of a local referendum would not be invoked absent legitimate concern of a substantial number of concerned citizens. *Id.*

Finally, in *Howlette v. City of Richmond,* 580 F.2d 704 (4th Cir. 1978), we affirmed a district court's ruling that an ordinance provision requiring each signature of a qualified voter on a petition for referendum to be verified before a notary was valid and constitutionally permissible. In that case, "the sole question for decision [was] whether enforcement of the City Charter requirement that each signature on a petition seeking a referendum be individually notarized is violative of Federal statutory or constitutional law." *Howlette v. City of Richmond,* 485 F. Supp. 17, 22 (E.D. Va. 1978). In deciding whether the petition requirement violated constitutional law, the district court held that "[a]lthough the court agrees that the right to vote may be characterized as fundamental, the Supreme Court has never held that the right to obtain or vote in a referendum is fundamental." *Id.* at 27.

From the cases discussed above, we affirm the district court's finding that this case does not implicate the fundamental right to vote.

The authorities on which Kendall relies do not support the proposition that limitations on referenda implicate fundamental rights. *See* Kendall's Opening Br. at 16. Of the cases Kendall cites, only two—*Stone v. City of Prescott*, 173 F.3d 1172 (9th cir.), *cert. denied,* 528 U.S. 870 (1999), and *City of Phoenix*, *Az. v. Kolodziejski*, 399 U.S. 204 (1970)—even mention the referendum right. The court in *Stone* ruled against those claiming an unconstitutional violation of their right to referendum, because they "identified no federal or state right that the [local government] violated." 173 F.3d at 1176. The Court in *City of Phoenix* held invalid the *per se* exclusion of all non-property owners from voting in a referendum concerning a bond issue. 399 U.S. at 213. That holding, which addressed a problem of complete disenfranchisement, does not apply to EL § 6-203, which addresses the verification of voter identity.

Additionally, we decline to adopt Kendall's reliance on the Ninth Circuit's decision in *Lemons v. Bradbury,* 538 F.3d

1098 (9th Cir. 2008). In *Lemons,* the Ninth Circuit concluded that state regulations on the initiative and referendum process "implicate the fundamental right to vote." *Id.* at 1102. There, the Ninth Circuit reasoned that both the initiative and referendum powers serve as "basic instruments of democratic government," so both implicated the plaintiffs' fundamental right to vote. *Id.* at 1103. The court proceeded to find that the regulations at issue would not be subjected to strict scrutiny, even though they implicated a fundamental right. *Id.* We find the reasoning of the *Lemons* court to be unpersuasive. As stated by the district judge:

> I am more persuaded by the reasoning of an earlier Ninth Circuit case, *Stone v. City of Prescott,* 173 F.3d 1172 (9th Cir. 1999), in which the court analyzed two Supreme Court cases addressing First Amendment rights in the context of referenda, *Meyer v. Grant,* 486 U.S. 414 (1988) and *Buckley v. Am. Const. law Found., Inc.,* 525 U.S. 182 (1999). . . . *Meyer* and *Buckley* held that the First Amendment protects political speech incident to an initiative campaign because it protects the *exercise* of the state-created right of referendum. The state-created right is not, however, in and of itself a fundamental right.
>
> J.A. 125-26.

The district court correctly recognized that this case does not implicate the right to vote. However, the district court also correctly recognized that where a state affords its citizens the privilege to pursue ballot initiatives or referenda, those privileges do enjoy some measure of constitutional protection. *See Taxpayers United,* 994 F.2d at 295 ("[A]lthough the Constitution does not require a state to create an initiative procedure, if it creates such a procedure, the state cannot place restrictions on its use that violate the federal Constitituion. . . .").

Therefore, after determining that Kendall's right to vote is not implicated in this case, we must then consider Kendall's other claims that his right to engage in politically protected speech, right to petition, and right to associate were denied. As to that analysis, a State may establish non-discriminatory and content-neutral limitations on any referendum or initiative procedure. *See Burdick v. Takushi*, 504 U.S. 428 (1992) ("[W]hen a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions."); *see also Doe v. Reed,* 130 S. Ct. 2811 (2010) (Sotomayor, J., concurring)("States enjoy considerable leeway to . . . specify the requirements for obtaining ballot access (*e.g.,* the number of signatures required, the time for submission, and the method of verification)); *Taxpayers United,* 994 F.2d at 297 ("We also conclude that the plaintiffs' rights to free speech and political association have not been impinged. Because the right to initiate legislation is a wholly state-created right, we believe that the state may constitutionally place nondiscriminatory, content-neutral limitations on the plaintiffs' ability to initiate legislation."); *Hoyle v. Priest,* 265 F.3d 699, 704 (8th Cir. 2001) ("the Arkansas law is content neutral and merely regulates who qualifies to legally sign an initiative petition, a restriction which does not violate the First Amendment.").

Therefore, when analyzing state-created restrictions that are both content neutral and nondiscriminatory, the State's important regulatory interests are generally sufficient to justify the restrictions. We do not use a higher level of scrutiny as we do in some First Amendment cases. As Justice Sotomayor explained in her concurrence in *Doe,* "requiring petition signers to be registered voters or to use their real names no doubt limits the ability or willingness of some individuals to undertake the expressive act of signing a petition. Regulations of this nature, however, stand 'a step removed from the communicative aspect of petitioning,' and the ability of States to

impose them can scarcely be doubted." *Doe,* 130 S.Ct. at 2827 (citing *Buckley v. Am. Constitutional Law Found., Inc.,* 525 U.S. 182 (1999; *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995) (contrasting measures to "control the mechanics of the electoral process" with the "regulation of pure speech")). Because content neutral and nondiscriminatory regulations on referendums are a "step removed from the communicative aspect of petitioning," "[i]t is by no means necessary for a State to prove that such 'reasonable, nondiscriminatory restrictions' are narrowly tailored to its interests." *Id.* at 2828 (citing *Anderson v. Celebrezze,* 460 U.S. 780, 788 (1983)). In *Doe*, the Supreme Court held that the State of Washington's requirement making referendum petitions available in response to requests under the State's Public Records Act did not violate individual signers of the referendum's First Amendment rights of freedom of speech and association when analyzed under an intermediate or "exacting" scrutiny standard. *Id.* at 2821. The Court held that the standard applicable to First Amendment challenges to disclosure requirements in the electoral context requires a substantial relation between the disclosure requirement and a sufficiently important government interest. *Id.* at 2818. Therefore, as set forth in *Doe*, challenges to content neutral and nondiscriminatory regulations on the referendum process are not analyzed under a strict scrutiny standard. In this case, we must find a substantial relation between the requirements of EL § 6-203 and a sufficiently important government interest.

We affirm the district court's finding that EL § 6-203 is content neutral and non-discriminatory and that the State's important regulatory interests are sufficient to justify the restrictions. As stated above, EL § 6-203 requires that:

> (a) Generally— To sign a [referendum] petition, an individual shall:
>
>> (1) sign the individual's name as it appears on the statewide voter registration list or the

individual's surname of registration and at least one full given name and the initials of any other names; and

(2) include the following information, printed or typed, in the spaces provided;

    (i)    the signer's name as it was signed;

    (ii)    the signer's address;

    (iii)    the date of signing; and

    (iv)    other information required by the regulations adopted by the State Board.

Therefore, the statute affords the signer four options in signing the petition. The signer can: (1) sign his/her name on the petition as it appears on his/her voter registration card; (2) sign his/her full first, middle and last names; (3) sign his/her full first name, middle initial, and last name; or (4) sign his/her first initial, and full middle and last names. A signature in any of those formats is valid for purposes of being a qualified signature on the petition.

This method is both content-neutral and non-discriminatory. The signature requirement is applied indiscriminately to all petition signers. And, the signature requirement is reasonably related to the purpose of detecting fraudulent or otherwise improper signatures. The signature requirement helps to make sure that false signatures are not put on the petition and that unregistered or ineligible voters do not sign it. As stated by the State Defendants, "the requirement discourages fraud by supplying a workably complete signature exemplar that those officials validating the signatures can use to confirm that the signer actually is who he or she claims to be." Appellees' Br. at 19. Therefore, because the

requirements of EL § 6-203 are not discriminatory or targeted at the content or purpose of any particular speech, expression, or assembly, the statutory requirements are constitutionally permissible.

This Court previously has rejected challenges comparable to Kendall's. In *Howlette v. City of Richmond, Va.,* 580 F.2d 704 (4th Cir. 1978) (per curiam), for example, the Court upheld the constitutionality of a municipal requirement that each person signing a referendum petition must swear to being a qualified voter and have his or her oath and signature individually notarized. *Id.* at 705. In holding that requirement constitutional, this Court adopted by reference the reasoning of the district court, which is instructive as applied to this case.

The petitioners in *Howlette* argued that the signature requirements constituted meaningless and discriminatory technicalities. *Howlette,* 485 F. Supp. at 22. The district court explained:

> [T]he individual notarization requirement affords material protection to each and every citizen of the City by assuring that the City will not be forced to undertake the substantial preparation and expense of conducting a referendum unless the requisite number of qualified City voters have actually signed the petitions, and have done so only after exercising due deliberation. In short, the individual notarization requirement protects the City and its citizens against both fraud and caprice.

*Id.*

The requirements of 6-203 afford similar protections to the State of Maryland, but are far less burdensome, requiring only, in essence, some ascertainable correlation between the signer's signature and the name he or she used when register-

ing to vote. The Maryland procedures in this case do nothing more than impose nondiscriminatory, content-neutral restrictions on the plaintiffs' ability to use the referendum procedure that serve Maryland's interest in maintaining the integrity of its referendum process. Our result might be different if Kendall was challenging a restriction on his ability to communicate with other voters about proposed legislation, or if he alleged he was being treated differently than other groups seeking to obtain a referendum on legislation. But, in the instant case, it is constitutionally permissible for Maryland to condition the use of its referendum procedure on compliance with content-neutral, nondiscriminatory regulations that are, as here, reasonably related to the purpose of administering an honest and fair referendum procedure. Accordingly, we conclude that the restrictions of EL § 6-203 do not violate Kendall's right to freely associate, his right to petition the government, his right to vote, or his first amendment right to engage in "politically protected speech."

V.

The second count of Kendall's amended complaint asserted that all the Defendants had denied him due process and equal protection in violation of the Fourteenth Amendment of the United States Constitution. The district court found that Kendall had not demonstrated that the County board violated his right to equal protection. In doing so, the court held that strict scrutiny did not apply because no fundamental right is involved (*i.e.*, the right to referendum does not implicate the fundamental right to vote) and because the law does not discriminate against a suspect class. "Although Defendants' application of Section 6-203 to Plaintiff's signature (and others) on the HCCOG petition did distinguish between individuals whose signatures were thrown out because they did not meet the requirements of Section 6-203 and those whose signatures were accepted because they did meet said requirements, Plaintiff has not demonstrated that he, as a result of being an individual whose signature was not in compliance,

was a member of a suspect class." J.A. 128-29. The court stated that, unless the state regulation "involves a fundamental right or a suspect class, it is presumed to be valid and will be sustained 'if there is a rational relationship between the disparity of treatment and some legitimate government purpose.'" J.A. 128 (quoting *Veney v. Wyche,* 293 F.3d 726, 731 (4th Cir. 2002)). Thus, the district court concluded that Defendants' actions in applying Section 6-203 to Kendall's signature were valid in that there is a rational relationship between separating those signatures which meet Section 6-203's requirements from those which do not and a legitimate governmental purpose of detecting fraudulent or otherwise improper signatures upon a referendum petition.

The district court correctly held that Defendants did not violate Kendall's right to equal protection. As analyzed by the district court and discussed above, the right to referenda does not implicate the fundamental right to vote. Further, Kendall has not demonstrated that he was a member of a suspect class. Distinguishing between those who signed the petition in accordance with EL § 6-203 and those who did not is not a disparity of treatment against a suspect class. *See Taxpayers United,* 994 F.2d at 297 (plaintiffs pursuing ballot initiative "have not challenged they are members of a suspect class"); *Kelly,* 608 F. Supp. at 1039 (statutory requirements concerning referendum signatures "do not involve . . . suspect classifications"). Therefore, as no fundamental right is implicated and as there is no presence of discrimination against a suspect class, strict scrutiny is not appropriate in this case and the Defendants' decision to verify some signatures and not others in accordance with § 6-203 will pass muster if it is reasonably related to a legitimate government interest. *Taxpayers United,* 994 F.2d at 297 (citing *Moore v. City of E. Cleveland,* 431 U.S. 494 (1971)).

In this case, the district court correctly found that there is a rational relationship between separating those signatures which meet 6-203's requirements from those which do not

and that there is a legitimate governmental purpose of detecting fraudulent or otherwise improper signatures upon a referendum petition. States have a legitimate interest in safeguarding the fairness and honesty of all elections and have an interest in ensuring that the State and affected local jurisdictions should not incur the considerable administrative responsibilities attending a referendum unless there is a proven interest by a reasonably large segment of the electorate. *See Burdick,* 504 U.S. at 433 ("Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections . . . if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process."); *Taxpayers United,* 924 F.2d at 297 ("[A] state has a strong interest in ensuring that its elections are run fairly and honestly."); *Howlette,* 485 F. Supp. at 28 (recognizing local government's "compelling interest in preventing electoral fraud" and in "discouraging unnecessary or capricious referenda"). Moreover, since Kendall has not alleged that any fundamental right or suspect classification is involved, it is irrelevant that Maryland could have chosen a better method of protecting its interest in guaranteeing an honest referendum system. *See Taxpayers United,* 994 F.2d at 298 (citing *Schweiker v. Wilson,* 450 U.S. 221 (1981) ("The equal protection obligation . . . is not an obligation to provide the best governance possible.")).

Therefore, because the requirements of EL § 6-203 pass a rational basis review, the district court correctly concluded that Kendall's right to equal protection has not been denied.

The district court also correctly found that Kendall was not denied his right to substantive due process. We have noted that "while liberty interests entitled to procedural due process protection may be created by state law as well as the Constitution itself, those entitled to substantive due process protection (whatever the procedures afforded) are 'created only by the Constitution.'" *Hawkins v. Freeman,* 195 F.3d 732, 748 (4th

Cir. 1999) (quoting *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 229 (1985)). As discussed above, application of EL § 6-203 to the referendum process did not violate a fundamental right created by the Constitution—the right to referendum does not implicate the right to vote and is a right created by the State, not by the Constitution. Therefore, the district court correctly found that Kendall had failed to state a claim that his right to substantive due process has been violated.

Finally, the district court found that Kendall failed to state a claim that his right to procedural due process had been violated. Kendall challenges the procedures used by the County Board in re-verifying the 2,603 signatures on the HCCOG petition that had been initially validated and certified on January 22, 2009. In order for Kendall to succeed on his procedural due process claim, he must show "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson,* 566 F.3d 138, 145 (4th Cir. 2009). Here, Kendall possesses a state-created right to petition legislation to referendum, and that right was deprived when the County Board invalidated his signature on the HCCOG petition. Therefore, the question is whether the procedures employed by the County Board were constitutionally inadequate. Procedural due process provides merely "a guarantee of fair procedures—typically notice and an opportunity to be heard." *Wolf v. Fauquier County Bd. of Supervisors,* 555 F.3d 311, 323 (4th Cir. 2009).

In this case, an email was sent on the evening of March 11, 2009 to several persons involved in the referendum process stating that the County Board "desires you to be present tomorrow evening at 5:30 PM at its meeting." At the meeting on March 12, 2009, Balcerzak stated that the County Board was reversing its January 22, 2009 decision certifying the first 2,603 signatures. Nordaas explained that the County Board found, after review of each signature on the petition, that it

had not validated each signature in accordance with the mandate set forth in *Doe,* and that upon advice from the Attorney General's office, the County Board re-verified the signatures on the petition submitted on December 30, 2008, and found that the total number of signatures fell below the 2,500 signatures necessary to qualify HCCOG for a thirty-day extension to secure the additional signatures. According to the Board, a written decision was presented at the meeting where members of HCCOG spoke and the decision of the Board was explained.

The district court found that the County Board's actions appear to have complied with the notice requirement of Maryland election law. Maryland law provides that once the local election authority has verified and counted the signatures submitted on a petition for referendum, the chief election official shall:

> (1) determine whether the validated signatures contained in the petition are sufficient to satisfy all requirements established by law relating to the number and geographical distribution of signatures; and

> (2) . . . determine whether the petition has satisfied all other requirements established by law for that petition and immediately notify the sponsor of that determination, including any specific deficiencies found.

> Md. Code, E.L. § 6-208(a).

State law further provides that within two business days of a determination that a petition is deficient, the chief election official of the election authority must notify the petition's sponsor of the determination. Md. Code, E.L. § 6-210(b). In this case, the district court noted that it appears that members of the HCCOG received notice of HCBE's final determination

regarding its petition on March 12, 2009, the same date as that provided on the written decision.

Maryland law does not require, nor did the County Board provide, notice to anyone associated with HCCOG that it was considering invalidating signatures on the HCCOG petition prior to making that determination. But, as the district court found, the fact that the County Board failed to provide notice to Kendall that his signature was being invalidated does not give rise to a due process violation. As the Seventh Circuit reasoned in *Protect Marriage Illinois v. Orr,* 463 F.3d 604, 608 (7th Cir. 2006):

> [W]hat is required in the name of due process depends, as the Supreme Court made clear in *Matthews v. Eldridge,* 424 U.S. 319, 335 (1976), on the costs as well as the benefits of process. The cost of allowing tens of thousands of people to demand a hearing on the validity of their signatures would be disproportionate to the benefits, which would be slight because the state allows the organization orchestrating a campaign to put an advisory question on the ballot, in this case Protect Marriage Illinois, to challenge the disqualification of any petitions.

We agree with the district court that, in this case, as in *Protect Marriage Illinois,* the costs of allowing thousands of people to demand a hearing on the validity of their signatures would be disproportionate to the benefits. Moreover, Maryland provides a procedure by which "a person aggrieved by a determination" that a petition is deficient may seek judicial review in the circuit court for the county in which the petition is filed. Md. Code, E.L. § 6-209(a)(1).

Apparently, HCCOG timely filed a Petition for Judicial Review of the County Board's final determination in the Circuit Court for Howard County seeking, in part, a declaratory judgment that the final determination be declared invalid.

Kendall, along with two other individuals, also filed a Complaint for Declaratory Judgment and Other Appropriate Relief in the Circuit Court for Howard County. According to Kendall, that case was unrelated to this one, and Kendall voluntarily dismissed that state court action after the County Board filed a motion to dismiss.

Crediting Kendall's assertion that the lawsuit he filed was unrelated to this once, then it appears Kendall did not file any challenge to the County Board's final determination in state court. For whatever reasons, Kendall chose not to pursue that course. As the Maryland Court of Appeals noted in *Doe,* a registered voter may bring the action for judicial review when a determination is made that results in aggrievement. *Doe,* 962 A.2d at 353.

We find that there was adequate process available to Kendall to provide an opportunity to be heard. "[A] procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies." *Elsmere Park Club, L.P. v. Town of Elsmere,* 542 F.3d 412, 423 (3rd Cir.2008).

Therefore, as the County Board provided adequate notice under the circumstances of the decision to invalidate the petition signatures and as there were adequate opportunities for review of the invalidation of Kendall's petition signature in state court, the district court was correct in finding that there was no violation of Kendall's right to procedural due process.

## VI.

Therefore, based on the foregoing, we affirm the district court's dismissal of Kendall's amended complaint for failure to state a claim upon which relief can be granted**.** Kendall has failed to state a claim for a denial of any of his constitutional

rights, and therefore his § 1983 claim was properly dismissed by the district court.

*AFFIRMED*