30 A.3d 245

# HOWARD COUNTY CITIZENS FOR OPEN GOVERNMENT, et al.

v.

# HOWARD COUNTY BOARD OF ELECTIONS.

**No. 503, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

Oct. 27, 2011.

───────────

Walter E. Carson, Woodbine, MD, for Appellant.

Gerald M. Richman, Ellicott City, MD, for Appellee.

Panel: MEREDITH, MATRICCIANI and KEHOE, JJ.

KEHOE, J.

In their County Charter, the voters of Howard County have reserved to themselves the right to right to refer laws of their County Council to referendum. For a referendum question to secure a place on the ballot, petitions containing the signatures of at least 5,000 of the County's registered voters must be filed within sixty days of the passage of the ordinance in question. The filing deadline may be extended for an additional thirty days if the sponsor of the referendum effort submits petitions containing at least 50% of the required signatures within the initial deadline.

Howard County Citizens for Open Government ("HCCOG") sought to take a newly-enacted ordinance of the Howard County Council to referendum. The Howard County Board of Elections (the "Board") decided that HCCOG failed to submit petitions containing a sufficient number of valid signatures to extend the filing deadline. HCCOG, and others,[1] sought judicial review of the Board's decision. The Circuit Court for Howard County affirmed the Board. HCCOG has appealed the court's judgment and presents the following questions, which we have reworded slightly:

───────────

1. The other appellants are Marc. E. Norman and Angela M. Bertram, who are registered voters in Howard County. For convenience, we will refer to the appellants as "HCCOG."

I. Whether the decision of the Board to invalidate previously approved registered voters on a referendum petition impermissibly burdened the citizens of Howard County in the exercise of rights secured by the Howard County Charter, State law and the Maryland Constitution?

II. Whether the Board's retroactive application of the *Doe v. Montgomery County,* 406 Md. 697 [962 A.2d 342] (2008), voter verification standards was unreasonable; or, in the alternative, whether the *Doe* standards themselves, as applied by the Board, and in light of *Montgomery County Volunteer Fire–Rescue Assoc. v. Montgomery County Board of Elections,* 418 Md. 463 [15 A.3d 798] (2011), impermissibly burdened the citizens of Howard County in the exercise of rights guaranteed by the Maryland Constitution and the Howard County Charter? [2]

III. Whether the decision of the Board to invalidate previously qualified registered voters on a referendum petition was unreasonable?

We affirm the judgment of the circuit court and, accordingly, the decision of the Board.

### BACKGROUND

On November 3, 2008, the Howard County Council passed Council Bill 58–2008, amending the Howard County Zoning Regulations to increase the maximum permitted size of a grocery store to be built in the Turf Valley community. HCCOG sponsored a petition drive to submit the bill to referendum, pursuant to HOWARD COUNTY, MD. CHARTER § 211

---

**2.** Although HCCOG cites *Volunteer Fire* in its statement of issues, it does not discuss the case in its brief. In light of this, we will simply state that *Doe* held that § 6–203(a)'s signature requirements were mandatory in order for a signature to be validated, while *Volunteer Fire* held that legibility was but one factor for the Board to consider in verifying signatures. *See Volunteer Fire,* 418 Md. at 479, 15 A.3d 798. The holdings of the two cases are not contradictory.

(2008).[3] In light of the current number of registered voters in the County, § 211 requires a sponsor to submit petitions containing the valid signatures of at least 5,000 voters registered in Howard County within sixty days of the enactment date of the ordinance in question. Section 211 also provides that, if the sponsor obtains at least 2,500 valid signatures before the end of the sixty days, the sponsor will have an additional thirty days to obtain the remaining required signatures.

On November 17, 2008, and November 19, 2008, HCCOG filed a request with the Board seeking a determination that the form and content of its proposed referendum petition and signature sheet complied with State law. The Board responded in the affirmative on December 1, 2008. HCCOG then began the process of circulating copies of the petitions and obtaining signatures. While there were several exchanges of

---

**3.** Section 211 provides in pertinent part:

§ 211.—**The referendum.**

(a) *Scope of the referendum.* The people of Howard County reserve to themselves the power known as "The Referendum," by petition to have submitted to the registered voters of the County to approve or reject at the polls, any law or a part (continued . . .) of any law of the Council. The referendum petition against any such law shall be sufficient if signed by five per centum of the registered voters of the County, but in any case not less than 1,500 nor more than 5,000 signatures shall be required. Such petition shall be filed with the Board of Supervisors of Elections of Howard County within sixty days after the law is enacted . . . provided, however, that if more than one-half but less than the full number of signatures required to complete any referendum petition against such law be filed within sixty days, . . . the time for the law to take effect and the time for filing the remainder of signatures to complete the petition shall be extended for an additional thirty days. . . .

(b) *Form of petition.* A petition may consist of several papers, but each paper shall contain a fair summary of the Act or the part of the Act petitioned upon; and there shall be attached to each such paper an affidavit of the person procuring the signatures thereon that, to the said person's own personal knowledge, each signature thereon is genuine and bona fide, and that to the best of his or her knowledge, information and belief the signers are registered voters of the State of Maryland and Howard County, as set opposite their names. The Board of Supervisors of Elections shall verify the registration of said petitioners.

correspondence between the Board's staff and HCCOG about matters related to the referendum drive, the topic of the legal requirements for valid signatures does not appear to have been addressed before HCCOG submitted petitions bearing 3,301 signatures to the Board on December 30, 2008, five days before the end of the initial sixty-day petition submission period.

On the following day, Betty L. Nordaas, the Howard County Election Director [4] notified HCCOG that, because "more than one-half but less than the full number of signatures required" by the Charter had been filed within sixty days, HCCOG had an additional thirty days, or until February 4, 2009, to file the remaining signatures. How the Board staff came to this conclusion is unclear, but the Board now asserts that its staff failed to consider the provisions of EL § 6–203(a) [5] (which sets

---

**4.** MD.CODE ANN., ELEC. LAW ("EL") § 2–206(b)(2) (2010) provides that each county board of elections shall appoint an election director "to manage the operations and supervise the staff of the local board."

**5.** The statute provides in relevant part:

§ 6–203. **Signers; information provided by signers.**

(a) *In general.*—To sign a petition, an individual shall:

(1) sign the individual's name as it appears on the statewide voter registration list or the individual's surname of registration and at least one full given name and the initials of any other names; and

(2) include the following information, printed or typed, in the spaces provided:

(i) the signer's name as it was signed;

(ii) the signer's address;

(iii) the date of signing; and

(iv) other information required by regulations adopted by the State Board.

(b) *Validation and counting.*—The signature of an individual shall be validated and counted if:

(1) the requirements of subsection (a) of this section have been satisfied;

(2) the individual is a registered voter assigned to the county specified on the signature page and, if applicable, in a particular geographic area of the county;

(3) the individual has not previously signed the same petition;

(4) the signature is attested by an affidavit appearing on the page on which the signature appears;

(5) the date accompanying the signature is not later than the date of the affidavit on the page; and

out the information that must accompany a petition signature) in this process. On January 22, 2009, Ms. Nordaas wrote to HCCOG informing it that the Board staff had completed the verification process [6] of the signatures contained in the initial submission and that 2,603 signatures were valid.

On January 26, 2009, Gerald M. Richman, Esquire, the Board's counsel in this appeal, was appointed as special counsel to the Board regarding the referendum effort. Mr. Richman alerted the Board's staff to *Doe v. Montgomery County*, 406 Md. 697, 962 A.2d 342 (2008), which had been filed on December 19, 2008. As we will discuss later in our analysis, the Court in *Doe* held that the provisions of EL § 6–203(a) were mandatory. The Board's staff then re-examined the signatures submitted by HCCOG to determine how many of them satisfied § 6–203(a)'s requirements.

While all of this was going on, HCCOG continued its efforts to obtain signatures to the petition. It submitted an additional 6,079 signatures on February 3, 2009. On March 11, 2009, the Board received advice from the Attorney General's office regarding the appropriate protocol for the verification and validation of petition signatures.

The Board held a meeting with representatives of HCCOG on March 12, 2009. In the meeting, Ann M. Balcerzak, the president of the Board, stated that the Board was reversing its previous decision that HCCOG had submitted at least one-half of the required signatures before the expiration of the initial, sixty-day deadline. She delivered to the representatives a letter of the same date from Ms. Nordaas, which

---

(6) if applicable, the signature was affixed within the requisite period of time, as specified by law.

\*　　\*　　\*

6. In addition to a board's obligation, under § 6–203, to validate signatures, a board must also verify either all, or a statistically significant representative sample, of the petition signatures. *See* EL 6–207. Verification is a process by which a board determines that a signature purporting to be that of a registered voter is genuine. *See Volunteer Fire*, 418 Md. at 479, 15 A.3d 798.

constitutes the decision of the Board for this proceeding. It reads in pertinent part:

On December 30, 2008, the HCCOG submitted Local Referendum Petitions, modified in accordance with Howard County Law containing 3,301 signatures. On January 22, a determination was issued to HCCOG ... advising that 2,603 valid signatures were ... submitted and that it thereby became entitled to an additional period of 30 days or until February 4, 2009 to obtain the remainder of valid signatures necessary....

As I am certain you are now aware, the Court of Appeals of Maryland, on December 19, 2008 issued a published opinion titled: *Doe v. Montgomery County Board of Elections*, 406 Md. 697, 962 A.2d 342 (2008). Counsel to the Howard County Board of Elections studied this opinion and advised the Board of Elections that a reassessment of the initial submission was necessary and appropriate based upon the clear principles and guidelines as outlined by Judge Battaglia in the *Doe* Opinion. The *Doe* court spent considerable time in setting forth the rationale related to the process of signing a referendum petition and in thereafter validating signatures on each petition. Succinctly put, the Board of Elections found, after review of each signature on submitted local referendum petitions, that it did not validate each signature in accordance with the mandate set forth in *Doe* which requires an individual *to sign his/her name as it appears on the statewide voter registration or place his/her surname of registration and at least one full given name and the initials of any other names.* The Opinion goes on to state that the requirements of subsection (a) *must* be satisfied in order to validate the signature.

The Board of Elections has requested revised guidelines from the State Board of Elections, reference COMAR Title 33.06.05.02(A), in order to complete an additional detailed review of each signature on the Local Referendum Petitions. The State Board of Elections has contacted the Attorney General's office in order to ensure the guidelines will be in agreement with the December 19, 2008 [*Doe* ]

opinion and is in the process of preparing the revised guidelines for Local Boards to use.

Based upon March 11, 2009 advice from the Attorney General's office, the Board of Elections re-verified and validated the signatures on the petitions submitted on December 30, 2008. The Board found that the total number of valid signatures fell below the 2,500 signatures [7] necessary to permit an additional thirty day period in which HCCOG may obtain the remainder of signatures necessary to complete the petition requirements.

(Emphasis in original.)

On March 16, 2009, Mr. Richman wrote to HCCOG's representatives confirming that the March 12 letter was "the final determination of the Board of Elections that the validated signatures contained in the Petition ... are insufficient to satisfy all requirements established by law."

HCCOG filed a petition for judicial review of the Board's decision.[8] The parties submitted memoranda to the circuit court and the court held a hearing on the matter on November 13, 2009. The parties presented substantially the same arguments to the circuit court as they present to us, which we discuss later in our analysis. The circuit court entered an

---

7. While the Board's Decision does not provide any further information on the second validation and verification process, it appears that the Board re-examined 1,216 signatures, a statistically valid sample of the 3,301 originally submitted, and concluded that 1,052, or 87%, failed to meet the legal standard enunciated in *Doe. Kendall v. Balcerzak,* 650 F.3d 515, 519–20 (4th Cir.2011) *cert. denied,* —— U.S. ——, 132 S.Ct. 402, —— L.Ed.2d ——, 2011 WL 3204885 (2011).

8. In addition, Paul Kendall, a signer of the petition, filed an action in the United States District Court for the District of Maryland against the Board, the State Board, and various state and county officials. Kendall alleged that the actions of the defendants violated the First Amendment of the United States Constitution by denying his rights to associate freely, to vote and to petition the government and also violated the Fourteenth Amendment by denying his rights to due process and equal protection. The District Court dismissed Kendall's complaint on the grounds that it failed to state a cause of action. Kendall appealed and the District Court's judgment was affirmed by the United States Court of Appeals for the Fourth Circuit in *Kendall,* 650 F.3d at 530.

order affirming the Board's decision on April 27, 2010. In affirming the Board, the circuit court stated:

The State may constitutionally limit, in a non-discriminatory and content neutral manner, the ability to initiate legislation.... Section 6–203 of the Election Law Article imposes nondiscriminatory content neutral restrictions. Therefore [HCCOG] has failed to demonstrate a violation of the right to vote.

Because [the Board] properly applied the *Doe* standard in evaluating the signatures on the subject petition, a fact supported by substantial evidence, and because the total number of signatures fell below the 2,500 signatures required by Section 211 of the Howard County Charter, the decision of [the Board] that such threshold had not been met, and that any extension of time for the submission of additional signatures would not be allowed, is affirmed.

This appeal followed.

ANALYSIS

## I. Standard of Review

■ In reviewing a circuit court's decision in a judicial review proceeding, an appellate court "look[s] 'through the circuit court's ... decision[ ], although applying the same standards of review, and evaluates the decision of the agency.'" *People's Counsel for Baltimore County v. Loyola College in Maryland,* 406 Md. 54, 66, 956 A.2d 166 (2008) (quoting *People's Counsel for Baltimore County v. Surina,* 400 Md. 662, 681, 929 A.2d 899 (2007)). HCCOG's contentions are limited to whether the Board committed an error of law in applying EL § 6–203 to the petition effort. Therefore, the deference that reviewing courts pay to factual findings made by administrative agencies, *see, e.g., Surina,* 400 Md. at 681, 929 A.2d 899, is inapplicable.

■ Courts typically do not defer to legal conclusions reached by agencies. *Loyola,* 406 Md. at 67, 956 A.2d 166; *Surina,* 400 Md. at 682, 929 A.2d 899. We do afford a limited degree of deference, however, to an agency's interpretations of

laws or regulations that the agency itself has either promulgated or administers. *Loyola,* 406 Md. at 67, 956 A.2d 166 (citing *Marzullo v. Kahl,* 366 Md. 158, 172, 783 A.2d 169 (2001)). However, the appropriate deference is finite. *See Volunteer Fire,* 418 Md. at 469, 15 A.3d 798 (Court will not defer to agency's interpretation of an unambiguous statute.); *Christopher v. Dept. of Health,* 381 Md. 188, 198, 849 A.2d 46 (2004) (While a court ordinarily gives weight to an agency's interpretation of a statute it administers, "[d]etermining whether an agency's 'conclusions of law' are correct is always, on judicial review, the court's prerogative. . . .").

## II. Maryland Law

In order to place HCCOG's contentions in their proper context, we will briefly review the provisions of the Maryland Constitution that establish the right of referendum in this State, and the pertinent provisions of Title 6 of the Election Law Article, which sets out requirements for referendum petitions and petition signatures, and also prescribes the review process of both by the appropriate election board.

### A. Article XVI of the Maryland Constitution

Ratified by the voters in 1915,[9] Article XVI reserves to the people of Maryland the power to petition to referendum most laws passed by the General Assembly. *See* Article XVI § 1.[10] Article XVI § 3 grants the right to refer local public laws to

---

**9.** For the background to, and history of, Article XVI, *see generally,* Dan Friedman THE MARYLAND STATE CONSTITUTION: A REFERENCE GUIDE 269–76 (2006) (hereafter "FRIEDMAN.")

**10.** Article XVI states:

Section 1. Reservation of power of referendum in people; article self-executing; additional legislation.

(a) The people reserve to themselves power known as The Referendum, by petition to have submitted to the registered voters of the State, to approve or reject at the polls, any Act, or part of any Act of the General Assembly, if approved by the Governor, or, if passed by the General Assembly over the veto of the Governor;

(b) The provisions of this Article shall be self-executing; provided that additional legislation in furtherance thereof and not in conflict therewith may be enacted.

referendum to voters in counties that do not exercise home rule powers.[11] By its terms, Article XVI does not apply to other units of local government. However, Article XI–F § 7,[12] reserves the referendum to voters in code counties. The right of referendum is also conferred by implication to voters in charter counties by Article XI–A § 1. *Ritchmount Partnership v. Board*, 283 Md. 48, 61, 388 A.2d 523 (1978) (The reservation of the right of referendum "directly affects the distribution of political power between the people of Anne Arundel County and their elected representative body . . . and is thus a fundamental feature of the overall structure of county government.").[13]

Article XVI § 4 authorizes the General Assembly to enact legislation, not inconsistent with Article XVI, to "facilitate the

---

**11.** Article XVI § 3 reads in pertinent part:

**Section 3. Number of signers necessary for petition; effect of petition signed by more than one third required number; time for filing petitions; meaning of "passed" and "enacted"; signing after passage.**

(a) The referendum petition against an Act or part of an Act passed by the General Assembly, shall be sufficient if signed by three percent of the qualified voters of the State of Maryland, calculated upon the whole number of votes cast for Governor at the last preceding Gubernatorial election, of whom not more than half are residents of Baltimore City, or of any one County. However, any Public Local Law for any one County or the City of Baltimore, shall be referred by the Secretary of State only to the people of the County or City of Baltimore, upon a referendum petition of ten percent of the qualified voters of the County or City of Baltimore, as the case may be, calculated upon the whole number of votes cast respectively for Governor at the last preceding Gubernatorial election.

**12.** Article XI–F states:

**Section 7. Enactment, etc. of public local law by county subject to referendum.**

Any action of a code county in the enactment, amendment, or repeal of a public local law is subject to a referendum of the voters of the county. . . . The General Assembly shall amplify the provisions of this section by general law in any manner not inconsistent with this Article. . . .

**13.** While *Ritchmount* was pending, the General Assembly enacted Article 25A § 8 "to give statutory support to the exercise of the right of referendum by citizens of chartered counties" if the county charter so provides. *Id.* at 54 n. 5, 388 A.2d 523.

petition process," including procedures for verifying the authenticity of petitions and signatures.[14]

The General Assembly first enacted such a statute in 1941. *See* 1941 Md. Laws 539. The statute, codified as MD. CODE ANN. Art. 33 § 169 (1957, 1964 Supp.), required a petition to show a signer's residence, the precinct or district in which the signer is registered as a voter and, in addition to the signer's signature, his or her printed or typed name. *See Barnes v. State ex rel. Pinkney*, 236 Md. 564, 569, 204 A.2d 787 (1964). Article 33 § 169 is the direct ancestor of EL 6–203. *See Doe*, 406 Md. at 729, 962 A.2d 342.

### B. Current Statutory Provisions

Subtitle 6 of the Election Law Article governs the referendum process, including requirements for petition signatures, § 6–203(a); signature validation, § 6–203(b); and signature verification, § 6–207. "Plainly, the overarching goal of the entire Petition Subtitle is to ensure that only eligible voters sign petitions...." *Volunteer Fire*, 418 Md. at 473, 15 A.3d 798.

Section 6–203 states in pertinent part:

---

14. Article XVI § 4 currently provides:
 **Section 4. Form of petition; verification of authenticity.**
 A petition may consist of several papers, but each paper shall contain the full text, or an accurate summary approved by the Attorney General, of the Act or part of Act petitioned. There shall be attached to each paper of signatures filed with a petition an affidavit of the person procuring those signatures that the signatures were affixed in his presence and that, based upon the person's best knowledge and belief, every signature on the paper is genuine and bona fide and that the signers are registered voters at the address set opposite or below their names. The General Assembly shall prescribe by law the form of the petition, the manner for verifying its authenticity, and other administrative procedures which facilitate the petition process and which are not in conflict with this Article.
 Prior to 1976, § 4 required that the affidavit of the person procuring signatures be made on the procurer's "own personal knowledge." *See Tyler v. Secretary of State*, 229 Md. 397, 402, 184 A.2d 101 (1962). Section 4 was amended to its current form by Chapter 548 of the Acts of 1976, and ratified by the voters on November 2, 1976. *See* FRIEDMAN at 366 n. 46.

## § 6–203. Signers; information provided by signers.

(a) *In general.*—To sign a petition, an individual shall:

(1) sign the individual's name as it appears on the statewide voter registration list or the individual's surname of registration and at least one full given name and the initials of any other names; and

(2) include the following information, printed or typed, in the spaces provided:

(i) the signer's name as it was signed;

(ii) the signer's address;

(iii) the date of signing; and

(iv) other information required by regulations adopted by the State Board.

(b) *Validation and counting.*—The signature of an individual shall be validated and counted if:

(1) the requirements of subsection (a) of this section have been satisfied;

(2) the individual is a registered voter assigned to the county specified on the signature page and, if applicable, in a particular geographic area of the county;

(3) the individual has not previously signed the same petition;

(4) the signature is attested by an affidavit appearing on the page on which the signature appears;

(5) the date accompanying the signature is not later than the date of the affidavit on the page; and

(6) if applicable, the signature was affixed within the requisite period of time, as specified by law.

In *Doe,* 406 Md. at 732–33, 962 A.2d 342, the Court of Appeals held that the requirements of § 6–203(a) are mandatory, rather than suggestive. Writing for the Court, Judge Battaglia explained that the process for the validation of

signatures pursuant to § 6–203(b) was distinct from the verification procedure authorized by § 6–207 [15] because:

> The purpose of validation, relating to whether the signature is sufficient, is to "provide additional means by which fraudulent or otherwise improper signatures upon a referendum petition may be detected," *see Barnes*, 236 Md. at 571–72 [204 A.2d 787], while the purpose of signature verification,

---

**15.** Section 6–207 provides:

**§ 6–207. Verification of signatures.**

(a) *In general.*—

(1) Upon the filing of a petition, and unless it has been declared deficient under § 6–206 of this subtitle, the staff of the election authority shall proceed to verify the signatures and count the validated signatures contained in the petition.

(2) The purpose of signature verification under paragraph (1) of this subsection is to ensure that the name of the individual who signed the petition is listed as a registered voter.

\* \* \*

(c) *Random sample verification.*—

(1) The process established under subsection (b) of this section shall provide for optional verification of a random sample of signatures contained in a petition.

(2) Verification by random sample may only be used, with the approval of the State Board:

(i) for a single-county petition containing more than 500 signatures; or

(ii) in the case of a multicounty petition, by a local board that receives signature pages containing more than 500 signatures.

(3) Verification under this subsection shall require the random selection and verification of 500 signatures or 5% of the total signatures on the petition, whichever number is greater, to determine what percentage of the random sample is composed of signatures that are authorized by law to be counted. That percentage shall be applied to the total number of signatures in the petition to establish the number of valid signatures for the petition.

(4) (i) If the random sample verification establishes that the total number of valid signatures does not equal 95% or more of the total number required, the petition shall be deemed to have an insufficient number of signatures.

(ii) If the random sample verification establishes that the total number of valid signatures exceeds 105% of the total number required, the petition shall be deemed to have a sufficient number of signatures.

(iii) If the random sample verification establishes that the total number of valid signatures is at least 95% but not more than 105% of the total number required, a verification of all the signatures in the petition shall be conducted.

relating to the existence of registration of the voter and the signature count, is to "ensure that the name of the individual who signed the petition is listed as a registered voter." Section 6–207.

406 Md. at 732, 962 A.2d 342.

Finally, the Court held that the right to judicial relief did not accrue until a party became aggrieved by an election board's final decision. The Court declared that, where, as in *Doe,* a petition drive is successful at the board level, the final decision of the board is its determination that the referendum petition satisfied *all* legal requirements, including the requisite number of signatures, pursuant to EL § 6–208(b).[16] *Doe,* 406 Md. at 718, 962 A.2d 342.[17]

*Doe* was filed on December 19, 2008, a few days prior to HCCOG's submission of the petitions bearing 3,301 signatures. The Board's staff was unaware of the *Doe* opinion when it conducted its initial validation and verification reviews of those signatures. After its initial reviews, the Board concluded that

---

**16.** Section 6–208 provides in relevant part:

§ 6–208. Certification.

(a) *In general.*—At the conclusion of the verification and counting processes, the chief election official of the election authority shall:

(1) determine whether the validated signatures contained in the petition are sufficient to satisfy all requirements established by law relating to the number and geographical distribution of signatures; and

(2) if it has not done so previously, determine whether the petition has satisfied all other requirements established by law for that petition and immediately notify the sponsor of that determination, including any specific deficiencies found.

(b) *Certification.*—If the chief election official determines that a petition has satisfied all requirements established by law relating to that petition, the chief election official shall certify that the petition process has been completed and shall:

(1) with respect to a petition seeking to place the name of an individual or a question on the ballot, certify that the name or question has qualified to be placed on the ballot; . . . .

**17.** In *Doe,* the Court did not identify the point at which the right to judicial review accrues when an election board determines that a petition effort lacks sufficient valid signatures. This issue is not before us and we express no opinion on the matter.

HCCOG had submitted more than the 2,500 validated and verified signatures required for a thirty-day extension of the submission period. When informed of Doe, the Board staff retraced its steps, and concluded that there were fewer than 2,500 validated and verified signatures and that HCCOG had therefore failed to meet the threshold. We now turn to HCCOG's objections to the process and the result.

### III. The Board's Application of EL § 6–203 to HCCOG's Petition

HCCOG's principal contention is that the Board erred in applying the requirements of EL § 6–203 to HCCOG's petitions. In essence, HCCOG's argument runs as follows: the right to referendum is a fundamental right guaranteed by the Maryland Constitution, Maryland law and the Howard County Charter. Because a voter's right to take a legislative enactment to referendum is fundamental, any regulation of the referendum process is subject to strict scrutiny review. Under strict scrutiny, such regulations are invalid unless the court finds that it furthers a compelling government interest and is narrowly tailored to serve that interest, so as to minimize interference with the exercise of the protected right. HCCOG asserts that there is no compelling government interest at issue in this case because there is no evidence of voter fraud or other impropriety. HCCOG claims that the Board's application of EL § 6–203, as construed by the Court of Appeals in *Doe,* unreasonably burdened the rights of Howard County's voters to participate in the referendum process by changing the standards for signatures in the middle of its referendum drive.[18]

_____

18. In its brief, HCCOG also states that the Board's decision was overbroad, disenfranchised HCCOG and Howard County residents, violated their substantiative rights to due process and equal protection and hindered HCCOG's right to petition one's government for the redress of grievances, to associate freely and to engage in politically protected speech. However, HCCOG does not present any argument or cite any authority to support these assertions. Because HCCOG failed to present these arguments with particularity, we will not consider them

We find HCCOG's arguments to be unpersuasive, for the following reasons. Section 6–203(a) does not conflict with Article XVI of the Maryland Constitution. While the referendum process enjoys a considerable degree of constitutional protection, the State may regulate the referendum process in a reasonable, content neutral, nondiscriminatory manner. The Howard County Charter does not restrict the State's authority to set standards for referendum petitions.

Second, § 6–203 is a reasonable and content neutral regulation of the referendum process. The Board's action in undertaking a second review process to assure that the petition signatures complied with the requirements of the statute did not unduly burden the supporters of the referendum effort.

We begin by noting that, while *Doe* cited *Barnes* with approval, 406 Md. at 729–30, 962 A.2d 342, and stated in passing that "the mandatory signature requirements of § 2–603(a)(1) are not unduly burdensome . . .," *id.* at 732 n. 28, 962 A.2d 342, *Doe* did not involve a direct constitutional challenge to the statute. *Id.* at 704, 962 A.2d 342 (setting out the issues for which a writ of *certiorari* had been granted). Therefore, we will consider whether § 6–203 passes constitutional muster in two contexts, first, the right of referendum established in Article XVI of the Maryland Constitution and second, the right of free speech guaranteed by the First and Fourteenth Amendments of the United States Constitution.[19]

---

further. *See* Maryland Rule 8–504(a)(5); *Mathis v. Hargrove*, 166 Md.App. 286, 318, 888 A.2d 377 (2005).

We should also make it clear what HCCOG is *not* contending. HCCOG does not assert that the Board misapplied § 6–203's requirements with regard to individual signatures or categories of signatures. Nor does HCCOG argue that the Board's actions implicated its members' right to vote as guaranteed by Article I § § 1–4 of the Maryland Constitution. *See Nader v. Board of Elections*, 399 Md. 681, 708, 926 A.2d 199 (2007); *Green Party v. Board of Elections*, 377 Md. 127, 165, 832 A.2d 214 (2003). (This argument was raised in *Kendall*, and rejected by the Court of Appeals for the Fourth Circuit. See *Kendall*, 650 F.3d at 522–23.)

**19.** Article 40 of the Maryland Declaration of Rights provides that "every citizen of the State ought to be allowed to speak, write and publish his

### A. Is 6–203(a) Consistent with Article XVI?

Our analysis of this issue starts with *Barnes*. The *Barnes* case grew out of a challenge to the State's Public Accommodations Law [20] on the basis that the Secretary of State illegally refused to accept a petition to submit the statute to referendum. The Secretary rejected a number of signatures that complied with the then-existing requirements of Article XVI, § 4, but did not meet then Article 33 § 169's requirement that a petition's signature sheet show the signer's residence, contain a typed or printed version of the signer's name and identify the precinct or voting district in which the signer resided. 236 Md. at 570, 204 A.2d 787.

Barnes contended that § 169 was inconsistent with Article XVI § 4 of the Constitution and was thus invalid. *Id.* at 567, 204 A.2d 787. In analyzing the argument, the Court stated:

> These statutory requirements pertain only to the identification of the signer. They do not affect the Constitutional provision with respect to the affidavit of the person who procured the signatures, except insofar as they may provide means of checking the truth of the affidavit.... Clearly, the provisions of the Article will be furthered if, by proper and reasonable means, a referendum petition is to be put upon the ballot only if it has the requisite number of genuine signatures of registered voters. We hold that the statutory

sentiments on all subjects, being responsible for the abuse of that privilege."

Maryland courts have traditionally treated Article 40 as *in pari materia* with the First Amendment to the United States Constitution. *State v. Brookins*, 380 Md. 345, 350 n. 2, 844 A.2d 1162 (2004); *The Pack Shack, Inc. v. Howard County*, 377 Md. 55, 64, 832 A.2d 170 (2003). However, "simply because a Maryland constitutional provision is *in pari materia* with a federal one or has a federal counterpart, does not mean that the provision will always be interpreted or applied in the same manner as its federal counterpart." *Dua v. Comcast Cable*, 370 Md. 604, 621, 805 A.2d 1061 (2002). HCCOG does not present an argument based upon Article 40, and we will restrict our analysis to HCCOG's First Amendment arguments. *See Brookins, supra.*

**20.** Now codified as § 20–301 *et seq.* of the State Government Article.

provisions are not in conflict with Section 4 of Article XVI of the Constitution.

*Id.* at 571, 204 A.2d 787.

We now turn to the current statute. Section 6–203(a) requires a signer of a petition to "sign the individual's name as it appears on the statewide voter registration list or the individual's surname of registration and at least one full given name and the initials of any other names" and to include the following information, whether typed or printed: "(i) the signer's name as it was signed; (ii) the signer's address; (iii) the date of signing; and (iv) other information required by regulations adopted by the State Board." [21] A significant change between § 6–203 and the statute at issue in *Barnes* is that § 6–203 requires the signature to either match the name on the voter registration list or, at a minimum, to contain the same surname and "at least one full given name and the initials of any other names." In addition, § 6–203 omits the requirement that a signer identify his voting precinct. These requirements are not inconsistent with Article XVI § 4 because the constitutional provision addresses only the form and contents of the affidavit to be signed by the person procuring the signatures on the petition sheet. Taken as a whole, § 6–203(a)'s requirements do nothing more than " 'provide additional means by which fraudulent or otherwise improper signatures ... may be detected.' " *Doe,* 406 Md. at 733, 962 A.2d 342 (quoting *Barnes,* 236 Md. at 571–72, 204 A.2d 787). Based upon *Barnes,* 236 Md. at 571–72, 204 A.2d 787, we hold that § 6–203(a) is consistent with the provisions of Article XVI § 4.

### B. Does § 6–203 Impose an Unreasonable Burden on the Right of Referendum?

█ HCCOG cites *Buckley v. American Constitutional Law Foundation,* 525 U.S. 182, 186, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999), along with other federal decisions, as standing for the proposition "that the right of referendum,

---

**21.** HCCOG does not argue that any requirement imposed by the State Board of Elections is pertinent to this case.

once granted, enjoys a mantle of protection under the First Amendment, safeguarding it from impermissible burdens." HCCOG asserts that § 6–203, as applied to its petition drive, is just such a burden. HCCOG's arguments are not persuasive.

The referendum process is a " 'basic instrument of democratic government.' " *Ritchmount*, 283 Md. at 61, 388 A.2d 523 (quoting *Eastlake v. Forest City Enters., Inc.*, 426 U.S. 668, 679, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976)). Moreover, the act of circulating a referendum petition can constitute " 'core political speech' because it 'involves interactive communication concerning political change.' " *Buckley*, 525 U.S. at 186, 119 S.Ct. 636. Such activity is afforded "First Amendment protection . . . at its zenith." *Id.* at 187, 119 S.Ct. 636. On the other hand, states have an "undoubtedly important interest in protecting the integrity and reliability of the initiative process." *Doe v. Reed*, —— U.S. ——, 130 S.Ct. 2811, 2819, 177 L.Ed.2d 493 (2010); *see also Buckley*, 525 U.S. at 191–92, 119 S.Ct. 636 (States "allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally . . . .").

The tension between the concepts of "constitutional protection at its zenith" and "considerable leeway" is resolved on a case-by-case basis and the Supreme Court has noted that there is " 'no litmus-paper test' [to] separate valid ballot-access provisions from invalid interactive speech restrictions . . . ." *Id.* at 192, 119 S.Ct. 636 (quoting *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974)). Instead:

A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration

the extent to which those interests make it necessary to burden the plaintiff's rights.

Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance. But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions.

*Burdick v. Takushi,* 504 U.S. 428, 433–434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (citations and internal quotation marks omitted).

In *Doe v. Reed,* the Supreme Court applied the *Burdick* analysis in a referendum petition case. The specific issue before the Court was whether the First Amendment rights of petition signers would be violated by the State of Washington's disclosure of petition signature pages in response to a request through Washington's Public Records Act. 130 S.Ct. at 2817. The Court began its analysis by noting that, while signing a petition communicates, at the very least, the signer's "political view that the question should be considered by the whole electorate," signing a petition also:

has legal effect in the electoral process. But that is not to say that the electoral context is irrelevant to the nature of our First Amendment review. We allow States significant flexibility in implementing their own voting systems. To the extent a regulation concerns the legal effect of a particular activity in that process, the government will be afforded substantial latitude to enforce that regulation.

130 S.Ct. at 2818 (citing *Burdick,* 504 U.S. at 433–434, 112 S.Ct. 2059).

Characterizing the possible application of Washington's Public Records Act to referenda petitions as a "disclosure

requirement[ ] in the electoral context," the Court stated that the disclosure of the signature pages would be permitted only if the state demonstrated "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id.* at 2818 (internal quotation marks omitted) (citing *Citizens United v. FEC,* —— U.S. ——, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) and *Buckley v. Valeo,* 424 U.S. 1, 64, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)). The Court explained that, "[t]o withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* (internal quotation marks omitted) (citing, among other cases, *Davis v. FEC,* 554 U.S. 724, 744, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008) and *Buckley,* 424 U.S. at 64, 96 S.Ct. 612).

In applying the test, the Court noted that Washington's interest "in protecting the integrity and reliability of the initiative process is undoubtedly important." 130 S.Ct. at 2819. Washington's interest in identifying fraud is "particularly strong," not only because fraudulent signatures may produce fraudulent outcomes but also because such practices " 'drive[ ] honest citizens out of the democratic process and breed[ ] distrust of our government.' " *Id.* (quoting *Purcell v. Gonzalez,* 549 U.S. 1, 4, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (per curiam)).[22] Similarly, Washington has an interest in identifying duplicate signatures and the signatures of unregistered voters. *Id.* The Court concluded that disclosure of signature pages furthered these policies and that these interests outweighed any burden to the First Amendment rights of signers. *Id.* at 2821. We now return to § 6–203.

Initially, we recognize that the First Amendment interest asserted by HCCOG is different from that at issue in *Doe v. Reed.* In the latter case, the plaintiffs challenged the state's authority to disclose signature information. HCCOG, in con-

---

**22.** The Court noted that the "threat of fraud in this context is not merely hypothetical," and referred to "a number of cases of petition-related fraud across the country" cited by the parties and amici curiae. *Id.*

trast, takes issue with the scope of the State's ability to obtain identifying information in the first place.

Section 6–203(a) requires that "a signer . . . provide . . . a surname, one full given name, the initials of any other names, the signer's address and date of signing." *Doe,* 406 Md. at 732 n. 28, 962 A.2d 342. The requirement to have a match, or something reasonably resembling a match, between the signature on the petition and the signer's name as it appears on the voter registration list is designed to enable election officials to determine whether a signature is valid. *Doe,* 406 Md. at 697, 962 A.2d 342; *Barnes,* 236 Md. at 571–72, 204 A.2d 787. The same is true for § 6–203(a)'s requirement that a signer disclose his or her address. The statute's requirements are reasonably related to the State's "undoubtedly important" interest in "in protecting the integrity and reliability of the initiative process." The State's interest, in turn, outweighs any burden on the signer or HCCOG. *Doe v. Reed,* 130 S.Ct. at 2821.

We conclude that § 6–203(a) imposes "reasonable, nondiscriminatory restrictions" upon the right to sign a referendum petition and that the State's "important regulatory interests are generally sufficient to justify the restrictions." *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059.

## C. *The Howard County Charter*

HCCOG contends that, because the Howard County Charter reserves the right of referendum to its residents, the General Assembly does not have the authority to unreasonably burden the exercise of this right. Among the problems with this argument is the language of the Charter itself, which specifically provides that the "Board of Supervisors of Elections shall verify the registration of said petitioners." HOWARD COUNTY MD. CHARTER § 211(b). The verification process, which is mandated by the Charter, begins with § 6–203(a) because that statute requires that a signer provide the information which makes the process of verification possible. *Doe,*

406 Md. at 697, 962 A.2d 342; *Barnes,* 236 Md. at 571–72, 204 A.2d 787.[23]

Section 6–203 survives the constitutional challenges mounted by HCCOG. We turn now to HCCOG's remaining contentions.

## IV. Did the Board Retroactively Apply § 6–203?

Without elaboration, HCCOG argues that the Board's application of the signature validation requirements in § 6–203(a) to the petition signatures was retroactive and impermissibly burdened the right to referendum. HCCOG is incorrect.

■■■ . As a general rule, "[i]n the overwhelming majority of cases, a judicial decision sets forth and applies the rule of law that existed both before and after the date of the decision. . . . [I]n the ordinary case, no issue of a 'prospective only'[ ] application arises." *State v. Daughtry,* 419 Md. 35, 77, 18 A.3d 60 (2011) (footnote omitted) (quoting *American Trucking Ass'ns, Inc. v. Goldstein,* 312 Md. 583, 591, 541 A.2d 955 (1988) and citing *James B. Beam Distilling Co. v. Georgia,* 501 U.S. 529, 535, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991) (Retroactivity "is overwhelmingly the norm, and is in keeping with the traditional function of the courts to decide cases before them based upon their best current understanding of the law.") (internal citations omitted)). However, when

a decision of [the Court of Appeals] with regard to a constitutional provision, a statute, or a common law principle,[ ] is overruled on the ground that the decision represented an erroneous interpretation or application of the constitutional provision, statute, or common law principle, the

---

**23.** Moreover, the voters of the County cannot adopt a charter provision that is inconsistent with a general public law of the State such as § 6–203. *See, e.g., Bd. of Supervisors of Elections v. Smallwood,* 327 Md. 220, 242, 608 A.2d 1222 (1992) ("When a provision in a county charter conflicts with a public general law, the public general law prevails under. Art. XI–A, § 1."); *Montgomery County v. Board of Supervisors of Elections,* 311 Md. 512, 536 A.2d 641 (1988) (same). While the United States and Maryland Constitutions limit the State's authority to regulate the referendum process, the Howard County Charter does not.

question of whether the new ruling should be applied prospectively only is governed by the principles set forth in *Owens–Illinois* [, *Inc.*] *v. Zenobia*, 325 Md. 420, 470–72 [601 A.2d 633] (1992) . . . .[ ]

*Daughtry*, 419 Md. at 77–78, 18 A.3d 60 (footnotes omitted) (quoting *Walker v. State*, 343 Md. 629, 637, 684 A.2d 429 (1996)).

It is not necessary for us to further explore the issue of retroactivity because *Doe* represented no change in the law. The signature validation requirement set forth in EL § 6–203 has been the law, albeit in different forms, since 1941. *Barnes*, 236 Md. at 569, 204 A.2d 787. Section 6–203(a) has been in its current form since 2005, three years before the events occurring in this case. *See* 2005 Md. Laws 3262. In *Doe*, the Court construed the language of the statute as mandatory, a construction which, as it noted, was completely consistent with the holding in *Barnes*, 236 Md. at 569, 204 A.2d 787.[24]

## V. Procedural Due Process

HCCOG's final contention is that the Board's decision was made "without prior notice or procedural due process. There was no opportunity for HCCOG to be heard or explore meaningful alternatives." As we understand its argument, HCCOG claims that, had it been given an opportunity to do so, it would have argued to the Board that the "then existing Maryland State Board of Elections' 'Guidelines' did not require the action taken by the Board." It is certainly correct that HCCOG was unable to present this position to the Board before the Board made its decision. On the other hand, it had

_____

**24.** While the Board's application of EL § 6–203 to HCCOG's petition does not give rise to an issue of retroactivity, appellants' frustration is quite understandable. The Board's initial review of the petition signatures misled HCCOG into thinking that it had an additional thirty days to satisfy the petition requirements. However, the Board had the obligation to correct its error. Therefore, while we sympathize with appellants, the Board's initial error is not a basis to reverse its ultimate decision.

every opportunity to make the argument to us and failed to do so. Thus, it is impossible for us to conceive how HCCOG was prejudiced when the Board applied § 6–203 to the petitions, and came to a decision regarding those petitions, without first informing HCCOG.

In addition, as the Court of Appeals for the Fourth Circuit noted in *Kendall,* " 'what is required in the name of due process depends . . . on the costs as well as the benefits of the process.' " 650 F.3d at 529 (quoting *Protect Marriage Illinois v. Orr,* 463 F.3d 604, 608 (7th Cir.2006)). Subtitle 6 of the Election Law Article requires an election board to complete the counting and verification process within twenty days of the filing of the petition. EL § 6–210(c). If an election board determines that a petition effort is deficient, because of a lack of valid signatures or otherwise, it is required to notify the sponsor within two business days of the date of its decision. EL § 6–210(b). Finally, EL § 6–209 provides that a petition sponsor has the right to seek judicial review of, and declaratory relief regarding, an adverse decision.

Subtitle 6 clearly reflects the legislature's intention that, in the context of a referendum effort, an election board's limited resources should be focused on the "large and difficult" task, *Doe v. Reed,* 130 S.Ct. at 2820, that only it can perform—validating and verifying thousands of petition signatures in an abbreviated time-frame. Because of the expansive post-decision rights to judicial redress available to a petition sponsor, we see no reason to impose upon an election board the additional burden of providing notice and hearings.

We conclude that constitutionally adequate due process was afforded in this case.

**THE JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY IS AFFIRMED.**

**APPELLANTS TO PAY COSTS.**